WILLIAM W. FERGUSON v. EDWARD G. GIES.

*Civil rights—Discrimination on account of color—Right of action.*

A rule by which the keeper of a public restaurant discriminates against colored persons as to the part of the room in which he will serve them with refreshments, *solely* on account of their color, is in violation of the common law of this State, of which Act No. 130, Laws of 1885, is declaratory; and in a suit to recover damages for such violation the party thus discriminated against need not declare upon nor refer to said statute.

Error to Wayne. (Gartner, J.) Argued June 4, 1890. Decided October 10, 1890.

Case. Plaintiff brings error. Reversed. The facts are stated in the opinion.

*D. A. Straker*, for appellant.

*William Look* and *H. F. Chipman*, for defendant.

MORSE, J. The defendant, at and before the time this suit was brought, was the manager of a public restaurant in the city of Detroit, and was licensed by that munici-

pality to conduct such public restaurant. It was to all intents and purposes a public place. On August 15, 1889, the plaintiff, a colored man, in company with a friend, entered this restaurant, and; sitting down at one of the tables provided for that purpose, ordered supper. The plaintiff claims, in substance, that the restaurant was divided in two parts, not separate rooms, but one side or part of the room was known as the "restaurant side," and the other as the ".saloon side." The restaurant side was furnished with tables, covered with table-cloths. Glasses were on the tables, with napkins in them, and there was an electric fan over the tables. The tables had a very neat appearance. The tables on the saloon side were furnished with beer glasses, and were beer tables such as are usually found in saloons. The plaintiff testifies that he and his friend sat down on the restaurant side at the first table from the last in the second row, and called for a lunch. The waiter said: "I can't wait on you here." Ferguson said: "What do you mean by that?" The waiter replied:

"We cannot serve you kind of people here. It is against the rules of the house to serve colored people in the restaurant. If you want anything to eat, you will have to go on the other side of the house."

After waiting a few minutes Ferguson went to the office, and said to the defendant, "Mr. Gies, I came into your restaurant with a friend, and I have been insulted by one of your waiters," and told him what the waiter had said. Gies replied:

"That is all right. That is the rule of this. house, if you want anything to eat."

They had some conversation, which ended by defendant saying to plaintiff that he would get nothing to eat unless he went on the other side. Plaintiff asked if he could not sit at the table adjoining, or at any of the tables

behind him, which were empty, but the defendant refused to serve him at any of the tables on that side of the room. Plaintiff went away without eating anything. While he was sitting at the table, several white persons came in, sat down, and had refreshments at different tables on the restaurant side of the house.

The defendant admits that he refused to serve refreshments of any kind to the plaintiff at the table where he sat, for no other reason than that Ferguson was a colored man, and that he said to him:

"That is the rule of the house. We cannot serve colored people right at those certain tables."

But he testifies that he further said:

"Ferguson, there is no use in your waiting here. We cannot serve you at these tables. If you will sit over at the next table in the other row, I will see that you are served there all right, the same as any other person will be."

Ferguson said, "No." There was about six feet between the two rows of tables. Defendant admits also that there was a difference in the tables, being of different shape; that the tables at which he told Ferguson he might be served were at the time uncovered; and that the covers were taken off to accommodate the crowd that came in for beer; but testifies that he told plaintiff he would cover the table, and furnish it the same as the one he was sitting at, and that he should be waited upon and served the same as those on the other side of the room. Defendant denies that this was in the saloon part of his place. He says it was a part of the restaurant, but situated in a more private place, as the bar would hide them from the view of those in the front part of the place. There was no partition between the tables. They were in the same room, and divided only by space. Colored people

were not permitted to sit except in one part of the room, but white men were served wherever they liked.

The circuit judge, Hon. George Gartner, instructed the jury that the plaintiff was entitled, under the law, to full and equal accommodations at this restaurant with all other citizens; that—

"All citizens under the law have the same rights and privileges, and are entitled to the same immunities,—it makes no difference whether white or colored. A different idea or principle than this never rested in reason. The reasoning of Chief Justice Taney in his opinion in the *Dred Scott Case* is now largely and almost universally regarded as fallacious and contrary to the principles of law then claimed to exist. The emancipation of the slaves followed, and then the fifteenth amendment placed the colored citizen upon an equal footing in all respects with the white citizen. Since then, in many of the states, laws have been enacted to modify and overcome the prejudices entertained by many of the white race against the colored race, and to place the latter upon an equal footing with the former, with the same rights and privileges. Thus the Legislature of this State in 1885 passed a law with that object and for that purpose; and in certain instances a denial of such rights is made a crime under the law of this State."

He further said to the jury that, if they found that the plaintiff was denied full and equal accommodations, the defendant was liable in damages for such denial. So far the learned judge was eminently sound in his reasoning, and correct in his law, but in his application of the law to this particular case he was in error. The jury, under the defendant's own version of the transaction, should have been instructed to find a verdict for the plaintiff.

In his definition of "full and equal accommodations," the court said:

"It is claimed by the defendant that he did not refuse to serve the plaintiff, but told him substantially that he would not serve him on that side of the house, but that,

if he would go over and take a seat at a table on the other side of the room in the restaurant, he would then serve him in precisely the same manner in which he would be served at the table at which plaintiff had seated himself; and that the rule of the house was not to serve colored persons on that side of the house.   Now, gentlemen, the defendant would not have the right to refuse to serve the plaintiff in the restaurant proper; but it is claimed by the defendant that the saloon portion is divided from the restaurant, and that the table at which he requested the defendant to sit was in the restaurant. While the defendant had no right to make a rule providing for an unjust discrimination, still he would have the right, under the law, to make proper and reasonable rules for the conduct of his business, and governing the conduct of his patrons; and whether this was a reasonable rule I will submit to you for determination.   Thus, the defendant has the right to reserve certain portions of his business for ladies, and other portions for gentlemen, while he may also reserve other portions for his regular patrons or boarders.   He might also, under the law, reserve certain tables for white men, and others where colored men would be served, providing there be no unjust discrimination.   And this brings me to an explanation of the term which I have used, viz., 'full and equal accommodations.'   By this term 'full and equal' is not meant identical accommodations, but by it is meant substantially the same accommodation.   A guest at a restaurant has no more right to insist upon sitting at a particular table than a guest at a hotel has the right to demand a particular room, as long as the accommodations offered are substantially the same.   This is all the law demands and requires, and if you find from the evidence in this case that the defendant offered to serve the plaintiff in one part of the restaurant proper in the same manner as guests were served in other parts, and that he offered the plaintiff full and equal, although not identical, accommodations, and if you find that the rule made by the defendant did not make an unjust discrimination, but was reasonable, then your verdict must be for the defendant."

Under this charge, the jury found for the defendant. The fault of this instruction is that it permits a discrimination on account of color alone, which cannot be made

under the law with any justice. As far as it relates to the right of a restaurant keeper to make rules and regulations based upon other considerations, the charge is of no concern in this case, and we shall not express any opinion as to its correctness. But in Michigan there must be and is an absolute, unconditional equality of white and colored men before the law. The white man can have no rights or privileges under the law that are denied to the black man. Socially people may do as they please within the law, and whites may associate together, as may blacks, and exclude whom they please from their dwellings and private grounds; but there can be no separation in public places between people on account of their color alone which the law will sanction.

We have been cited to a large number of cases upholding the doctrine enunciated by the trial judge. It has been held that separate schools may be provided for colored children, if they are reasonably accessible and afford substantially equal educational advantages with those provided for white children. *State v. McCann,* 21 Ohio St. 198; *Bertonneau v. Directors,* 3 Woods, 177; *Ward v. Flood,* 48 Cal. 36, 45; *Cory v. Carter,* 48 Ind. 327; *Roberts v. Boston,* 5 Cush. 198; *People v. Easton,* 13 Abb. Pr. (N. S.) 159; *Dallas v. Fosdick,* 40 How. Pr. 249; *U. S. v. Buntin,* 10 Fed. Rep. 730; *People v. Gallagher,* 93 N. Y. 438. It has also been held that common carriers may provide different cars or separate seats for white and colored persons, if such cars or seats are equal in comfort and safety one with the other. *Railroad Co. v. Miles,* 55 Penn. St. 209; *The Sue,* 22 Fed. Rep. 843; *Logwood v. Railroad Co.,* 23 Fed. Rep. 318; *Railroad Co. v. Wells,* 85 Tenn. 613; *Murphy v. Railroad Co.,* 23 Fed. Rep. 637, 640; *Railway Co. v. Williams,* 55 Ill. 185. In *Day v. Owen,* 5 Mich. 520, this same principle was recognized; but it must be remembered that the decision, as in the·

case of *Roberts v. Boston,* 5 Cush. 198, was made in the
*ante bellum* days, before the colored man was a citizen,
and when, in nearly one-half of the Union, he was but a
chattel. It cannot now serve as a precedent. It is but
a reminder of the injustice and prejudice of the time in
which it was delivered. The negro is now, by the Con-
stitution of the United States, given full citizenship with
the white man, and all the rights and privileges of citizen-
ship attend him wherever he goes. Whatever right a
white man has in a public place, the black man has also,
because of such citizenship.

But this is not all. In 1885 the Legislature of this
State, by Act No. 130, enacted:

"Section 1. That all persons within the jurisdiction of
this State shall be entitled to the full and equal accom-
modations, advantages, facilities, and privileges of inns,
*restaurants,* eating-houses, barber-shops, public convey-
ances on land and water, theaters, and all other places
of public accommodation and amusement, subject only to
the conditions and limitations established by law, and
applicable alike to all citizens.

"Sec. 2. That any person who shall violate any of the
provisions of the foregoing section by denying to any
citizen, except for reasons applicable alike to all citizens
of every race and color, and regardless of color or race,
the full accommodations, advantages, facilities, or privi-
leges in said section enumerated, or by aiding or inciting
such denial, shall, for every such offense, be deemed guilty
of a misdemeanor, and, upon conviction thereof, shall be
fined not to exceed one hundred dollars, or shall be
imprisoned not more than thirty days, or both."

Section 3 provides that there shall be no discrimination
on account of race or color in the selection of grand and
petit jurors.

This statute exemplifies the changed feeling of our people
towards the African race, and places the colored man
upon a perfect equality with all others, before the law in
this State. Under it, no line can be drawn in the streets,
public parks, or public buildings upon one side of which

the black man must stop and stay, while the white man may enjoy the other side, or both sides, at his will and pleasure; nor can such a line of separation be drawn in any of the public places or conveyances mentioned in this act.

But it is claimed by the defendant's counsel that this statute gives no right of action for civil damages; that it is a penal statute; and that the right of the plaintiff under it is confined to a criminal prosecution. The general rule, however, is that where a statute imposes upon any person a specific duty for the protection or benefit of others, if he neglects or refuses to perform such duty, he is liable for any injury or detriment caused by such neglect or refusal, if such injury or hurt is of the kind which the statute was intended to prevent; nor is it necessary in such a case as this to declare upon or refer to the statute. The common law as it existed in this State before the passage of this statute, and before the colored man became a citizen under our Constitution and laws, gave to the white man a remedy against any unjust discrimination to the citizen in all public places. It must be considered that, when this suit was planted, the colored man, under the common law of this State, was entitled to the same rights and privileges in public places as the white man, and he must be treated the same there; and that his right of action for any injury arising from an unjust discrimination against him is just as perfect and sacred in the courts as that of any other citizen. This statute is only declaratory of the common law, as I understand it now to exist in this State.

Any discrimination founded upon the race or color of the citizen is unjust and cruel, and can have no sanction in the law of this State. The cases which permit in other states the separation of the African and white races in public places can only be justified on the princi-

ple that God made a difference between them, which difference renders the African inferior to the white, and naturally engenders a prejudice against the African, which makes it necessary for the peace and safety of the public that the two races be separated in public places and conveyances. This doctrine which runs through and taints justice in all these cases is perhaps as clearly and ably stated in *Railroad Co. v. Miles*, 55 Penn. St. 212, as anywhere. In that case, Judge Agnew says:

"If a negro take his seat beside a white man, or his wife or daughter, the law cannot repress the anger or conquer the aversion which some will feel. However unwise it may be to indulge the feeling, human infirmity is not always proof against it. * * To assert separateness is not to declare inferiority in either. It is not to declare one a slave, and the other a freeman. That would be to draw the illogical sequence of inferiority from difference only. It is simply to say that, following the order of Divine Providence, human authority ought not to compel these widely-separated races to intermix. The right of each to be free from social contact is as clear as to be free from intermarriage. The former may be less repulsive as a condition, but not less entitled to protection as a right. When, therefore, we declare a right to maintain separate relations as far as is reasonably practicable, but in a spirit of kindness and charity, and with due regard to equality of rights, it is not prejudice nor caste, nor injustice of any kind, but simply to suffer men to follow the law of races established by the Creator himself, and not to compel them to intermix contrary to their instincts."

This reasoning does not commend itself either to the heart or judgment. The negro is here, and brought here by the white man. He must be treated as a freeman or a slave; as a man or a brute. The humane and enlightened judgment of our people has decided—although it cost blood and treasure so to determine—that the negro is a man; a freeman; a citizen; and entitled to equal rights before the law with the white man. This decision was a

just one. Because it was divinely ordered that the skin of one man should not be as white as that of another furnishes no more reason that he should have less rights and privileges under the law than if he had been born white, but cross-eyed, or otherwise deformed. The law, as I understand it, will never permit a color or misfortune, that God has fástened upon a man from his birth, to be punished by the law unless the misfortune leads to some contagion or criminal act; nor while he is sane and honest can he have less privileges than his more fortunate brothers. The law is tender, rather than harsh, towards all infirmity; and, if to be born black is a misfortune, then the law should lessen, rather than increase, the burden of the black man's life.

The prejudice against association in public places with the negro, which does exist, to some extent, in all communities, less now than formerly, is unworthy of our race; and it is not for the courts to cater to or temporize with a prejudice which is not only not humane, but unreasonable. Nor shall I ever be willing to deny to any man any rights and privileges that belong in law to any other man, simply because the Creator colored him differently from others, or made him less handsome than his fellows, —for something that he could not help in the first instance, or ever afterwards remove by the best of life and human conduct. And I should have but little respect or love for Deity if I could for one moment admit that the color was designed by Him to be forever a badge of inferiority, which would authorize the human law to drive the colored man from public places, or give him less rights therein than the white man enjoys. Such is not the true theory of either the Divine or human law to be put in practice in a republican form of government, where the proud boast is that "all men are equal before the law." The man who goes either by himself or with

his family to a public place must expect to meet and mingle with all classes of people. He cannot ask, to suit his caprice or prejudice or social views, that this or that man shall be excluded because he does not wish to associate with them. He may draw his social line as closely as he chooses at home, or in other private places, but he connot in a public place carry the privacy of his home with him, or ask that people not as good or great as he is shall step aside when he appears. All citizens who conform to the law have the same rights in such places, without regard to race, color, or condition of birth or wealth. The enforcement of the principles of the Michigan civil rights act of 1885 interferes with the social rights of no man, but it clearly emphasizes the legal rights of all men in public places.

This idea of the equality of the races before the law was also shown in the legislation of 1867, relative to public schools, which declared that—

" All residents of any district shall have an equal right to attend any school therein." Act No. 34, Laws of 1867.

This legislation was construed by this Court as an act to prevent the exclusion of colored children from any public schools in the State, although separate schools for the education of blacks. and whites might exist, where the accommodations and advantages of learning were fully equal one with the other. *People v. Board,* 18 Mich. 400. Our holding in the present case is also supported by the following authorities: *Coger v. Packet Company,* 37 Iowa, 146; *Clark v. Directors,* 24 Id. 267; *People v. Board,* 101 Ill. 308; *Chase v. Stephenson,* 71 Id. 383; *Messenger v. State,* 25 Neb. 674; *Baylies v. Curry,* 128 Ill. 287; *Board v. Tinnon,* 26 Kan. 1; *Railroad Co. v. Green,* 86 Penn. St. 421; *Donnell v. State,* 48 Miss. 680; *Decuir v. Benson,* 27 La. Ann. 1. See, also, the able

dissenting opinion of Danforth, J., in *People v. Gallagher*, 93 N. Y. at pages 458–466, inclusive.

Under the circumstances, as admitted by the defendant upon this record, the only question to have been properly submitted to the jury was the amount of the plaintiff's damages. The judgment is reversed, and a new trial granted, with costs of both courts.[1]

The other Justices concurred.

---

[1] A second trial resulted in a verdict for the plaintiff of nominal damages.