Mrs. Susie Brown, Appellant, v. The J. H. Bell Company, and J. F. Lane, Appellees.

**Civil rights statute:** CONSTRUCTION. The Civil Rights Act requiring keepers of certain public places to afford equal accommodations and facilities for all persons creates a statutory offense not known to the common law, is penal in character and is to be strictly construed.

**Same:** RIGHTS: STATUTE: CONSTRUCTION. Our Civil Rights statute is both inclusive and exclusive in character, in that it is enforcible so far as applied to anything in the nature of an inn, public conveyance, public bath house, threatre, places of amusement, or other places of public or *quasi* public character specified therein, and has no application to the maintenance and conduct of a purely private business.

**Civil rights statute:** CONSTRUCTION: EQUAL PRIVILEGES: PLACE OF AMUSEMENT. A coffee merchant rented floor space from a grocery association conducting a pure food show to which an admission was charged by the association. In the space rented he conducted a booth from which he advertised coffee by serving the same gratis to prospective patrons, but had no interest whatever in the admission fee or the general entertainment furnished by the association. *Held,* that the coffee merchant was not conducting

a place of amusement within the Civil Rights Act, requiring equal privileges to all persons at theatres and other places of amusement.

Same: "OTHER PLACES WHERE REFRESHMENTS ARE SERVED." The phrase, "other places where refreshments are served," as used in the Civil Rights statute has reference solely to places in the nature of public inns, restaurants, eating houses, lunch counters, etc., as specifically designated in the act, and does not include a booth in a pure food show rented and maintained by a coffee merchant simply to display his goods by serving coffee gratis to prospective patrons.

Same: EQUAL PRIVILEGES: RACE DISTINCTION. A coffee merchant who rented floor space from an association conducting a pure food show from which he advertised his coffee by serving the same to prospective patrons without charge and for purely advertising purposes, but had no interest whatever in the pure food show or the admission fees charged therefor, could rightfully refuse to serve persons of a particular class although they paid the admission fee to the pure food show; and he was not therefore, liable under the Civil Rights statute for refusing to serve a colored person with coffee.

Evans, C. J., and Weaver, J., dissenting.

*Appeal from Polk District Court.*—HON. J. A. HOWE, Judge.

WEDNESDAY, NOVEMBER 17, 1909.

SUPPLEMENTAL OPINION, THURSDAY, FEBRUARY 17, 1910.

ACTION at law to recover damages under our civil rights statute. Defendants filed an answer, to which plaintiff demurred. Her demurrer being overruled, she appeals. —*Affirmed.*

*Geo. H. Woodson* and *S. Joe Brown,* for appellant.

*W. A. Graham,* for appellees.

DEEMER, J.—Plaintiff alleged: That she is a negro, or colored person, a citizen of good repute, and a resident

of Des Moines. That defendant is either a copartnership or corporation doing business under the name and style of the "J. H. Bell Company" and engaged in selling coffee in the city of Des Moines. That about November 23, 1907, defendant F. J. Lane was in charge of a certain booth or counter for the J. H. Bell Company at or in a certain place of amusement or entertainment in the city of Des Moines, known as the "Pure Food Show," to which the public was invited and an admission fee charged. That at said booth or counter of the Bell Company defendant Lane was on said day engaged in serving hot coffee to those of the general public who were admitted to the said "show," and that plaintiff, who was accompanied by her husband, secured a ticket and was admitted to the show and applied at defendants' booth or counter with certain white persons to be served with coffee. "That at the said time defendant F. J. Lane by himself and agents served all the Caucasians or white persons who applied along with this plaintiff; but in a very rude and ungentlemanly manner said defendant failed and refused to serve her or her said husband, stating at the time, 'We are not serving colored people here,' or words to that effect. That said refusal was made by defendant without any fault of the plaintiff, and without any reason applicable by law to all persons, and for the express reason on the part of defendants that plaintiff was a negro, or colored person." Damages are asked on account of humiliation, discrimination, and chagrin in the sum of $1,000.

The answer to which plaintiff demurred read in this wise:

Further answering, defendant states the facts to be: That on the said 23d day of November, 1907, at the time and place set out in the plaintiff's petition, he was in charge of a certain booth of the Des Moines Pure Food Show leased by J. H. Bell Company from the Des Moines Retail Grocers' Association by written contract, a copy of

which is hereto attached, marked 'Exhibit A,' and made a part hereof. That the said pure food show was held at the place set out in plaintiff's petition, to wit, at Eighth and Locust Streets, in Des Moines, Iowa, during a period of time which included the said 23d day of November, 1907, by the Des Moines Retail Grocers' Association, a corporation, and that the said contract or lease, Exhibit A, was executed by and between the said corporation and the said J. H. Bell Company. That the said pure food show was so held by the Des Moines Retail Grocers' Association for the purposes of affording an opportunity to manufacturers and vendors of food stuffs to exhibit and advertise their wares, for which purpose said corporation leased to said manufacturers and vendors, by written contracts in terms identical with Exhibit A, booths in the hall in which said show was conducted. That the said Des Moines Retail Grocers Association invited the public to attend the said food show by advertisements in the daily press, and charged an admission fee thereto, which said fee admitted all persons who had paid the same to the hall in which the food show was held. That the said admission fees so charged and collected by the said Des Moines Retail Grocers' Association became and were the property of the said corporation, and that no lessee of the said corporation or exhibitor in the said food show, including J. H. Bell Company and this defednant, had any interest, share, or property in the same, or any part thereof. That the said J. H. Bell Company, a corporation organized and existing under and by virtue of the laws of Illinois, under the terms of the written contract, Exhibit A, occupied a booth in said food show for the purpose only of exhibiting and advertising certain brands of coffee of which said corporation was the vendor. That defendant F. J. Lane was in charge of said booth for the purpose only of exhibiting and advertising said coffees. That neither said corporation, J. H. Bell Company, or this defendant, exercised, or attempted to exercise, any control of or had any part or share in the management of the said pure food show, except to control the conduct of said leased booth. That the method of advertising the said coffee employed by J. H. Bell Company and this defendant at said booth at the time and place set out in said petition was to

donate to persons who are admitted to the hall in which said food show was held and from whom in their judgment they would secure business returns, samples of said coffee prepared in liquid form as for table use, which said method of advertising was termed "demonstrating" the said coffees. That the liquid coffee so served as aforesaid was the property solely of the said corporation, J. H. Bell Company, and that neither the said Des Moines Retail Grocers' Association nor the management of the pure food show had any interest or property therein, and neither controlled or attempted to control the said J. H. Bell Company or this defendant in the distribution or service thereof, and that neither said Des Moines Retail Grocers' Association or the management of the said pure food show exercised, or attempted to exercise, any control or direction of the method of advertising employed by the said J. H. Bell Company or this defendant, except as the same was limited by said contract, Exhibit A. That on the said 23d day of November, 1907, plaintiff and her husband, S. Joe Brown, were admitted to the said hall in which the said pure food show was being held by tickets of admission which had been theretofore donated to them by a grocer of whom they were customers in Des Moines, Iowa; said tickets having been purchsed by said grocer from the Des Moines Retail Grocers' Association. That thereupon, at the said time and place, plaintiff and her husband visited all of the booths in the said pure food show excepting that of J. H. Bell Company, and received free and gratuitous donations of samples of the various food stuffs being exhibited and advertised at said booths, all of which were then and there employing the same method of advertising the wares upon exhibit as heretofore set out, to wit, that of donating prepared samples of said wares to persons who had been admitted to the hall in which said pure food show was held, and from whom business results were anticipated. That said samples of said coffee were so donated in small cups free and without charge, and for the purpose of advertising said coffees. Then, after visiting all other booths, said plaintiff and her husband approached the said booth leased and occupied and used as hereinbefore set out by the said J. H. Bell Company, and of which this defendant was in charge, as heretofore stated.

That when said plaintiff and her husband had arrived at the front of the said booth said counter being then crowded with ladies who were receiving donations of samples of said coffee as hereinbefore stated, this defendant did then and there address the plaintiff and the husband of the said plaintiff as follows: "We are not serving the colored people at the booth. If you will take seats we will be glad to serve you." That then and thereupon said husband of the plaintiff answered, "We were not born in those States where we have to do that," to which this defendant then and there replied, "This is positive, move on." That then and thereupon this defendant informed the said husband of plaintiff as to his own name and the name of the corporation of whose booth he was in charge, to wit, J. H. Bell Company, and that then and thereupon said plaintiff and her husband left said booth and left said pure food show.

The space contract referred to in this answer provides, in substance: That for and in consideration of the sum of $40 the Grocers' Association leased space to the Bell Company in the building where the pure food show was to be held, subject to certain conditions, among which were that the space should not be sublet, that:

All orders taken must be cash orders. The profit from goods sold and delivered from the booth to revert to the grocer entitled to the same or the association. No advertising matter or samples will be permitted to be thrown among the patrons or distributed at the main entrance or any other portion of the building except from the inside or three feet of the outside of each individual booth. All aisle space belongs to the association, and no exhibit or advertising will be allowed to extend beyond the space allotted to the exhibitor or allowed carried or displayed in aisles as shown in prospectus. The show building will be open for the placing of exhibits four days prior to the date of opening, after 8 a. m. The food show will be open from 1:30 to 5:30 and 7:30 to 10:30 p. m. daily except Sunday. On opening day the doors will not be open until 7:30 p. m., when all exhibits must be in readi-

ness and all exhibits must be open and no goods removed until after 10:30 of the last day. All goods placed in this show will be at the risk of the owner.

The demurrer was upon the ground that the facts pleaded did not constitute a defense. The demurrer was overruled, and we have to determine whether or not the facts so pleaded in defense, which must for the purposes of the case be taken as true, show a violation of our civil rights statute. That statute (Code, section 5008) reads as follows:

All persons within this State shall be entitled to the full and equal enjoyment of the accommodations, advantages, facilities and privileges of inns, restaurants, chophouses, eating houses, lunch counters and all other places where refreshments are served, public conveyances, barber shops, bathhouses, theaters and all other places of amusements. Any person who shall violate the provisions of this section by denying to any person, except for reasons by law applicable to all persons, the full enjoyment of any of the accommodations, advantages, facilities or privileges enumerated herein, or by aiding, or inciting such denial shall be guilty of a misdemeanor.

Divorced of all sentiment, the question is purely one of statutory construction, and it is not for the courts to extend the remedy or to give to the language used in the act an interpretation which it will not reasonably bear. There was no such offense known to the common law, and the liability and the remedy are both creatures of the statute. The statute is penal in character, and it is held by all courts that it should be strictly construed. *Grace v. Mosely*, 112 Ill. App. 100; *Fruchey v. Eagleson*, 15 Ind. App. 88 (43 N. E. 146); *Burks v. Bosso*, 180 N. Y. 341 (73 N. E. 58, 105 Am. St. Rep. 762). Although the federal Congress passed a civil rights act (Act March 1, 1875, c. 114, 18 Stat. 335 [U. S. Comp. St. 1901, 1259]; 1 Fed. St.

1. CIVIL RIGHTS STATUTE: construction.

Ann. 805) of date March 1, 1875, this Act was held unconstitutional in so far as it assumed to regulate such matters in the State and as unwarranted by either the thirteenth or fourteenth amendments to the Constitution. See Civil Rights Cases, 109 U. S. 3 (3 Sup. Ct. 18, 27 L. Ed. 835). But most of the Northern States have passed statutes patterned largely after that Act, and, these statutes, although differing in some respects, have often been before the state courts for review. As applied to business of a public or *quasi* public character conducted for the accommodation, refreshment, amusement, or instruction of the public, these statutes have been held to be a valid exercise of the police power. *Greenburg v. Western Turf Assn.,* 148 Cal. 126 (82 Pac. 684, 113 Am. St. Rep. 216); *Rhone v. Loomis,* 74 Minn. 203 (77 N. W. 31); *Messenger v. State,* 25 Neb. 674 (41 N. W. 638); *Donnell v. State,* 48 Miss. 661 (12 Am. Rep. 375); *People v. King,* 110 N. Y. 428 (18 N. E. 245, 1 L. R. A. 293, 6 Am. St. Rep. 389). It has also been held that, as applied to carriers and innkeepers, these statutes are merely declaratory of the common law. *Ferguson v. Gies,* 82 Mich. 358 (46 N. W. 718, 9 L. R. A. 589, 21 Am. St. Rep. 576); *West Chester R. Co. v. Miles,* 55 Pa. 215 (93 Am. Dec. 744).

Manifestly the statute under consideration was not made to, nor does it, apply to every private business, even if the Legislature had power to make it so read, and the enumeration of places in the nature of inns

2. SAME.

or places where refreshments are served, of public conveyances, barber shops, and places of amusements, necessarily excludes all other places of business or places of amusement not of the kind enumerated. There is no doubt of the validity of the statute as applied to anything in the nature of an inn, public conveyance, public bath house, theater, or other place of amusement. Whether or not such a statute can be made applicable to a private barber shop we have no occasion now to determine. The

other institutions are either public or *quasi* public in character and the Legislature has undoubted power of control. These civil rights acts do not confer equality of social intercourse, and it is doubtful, to say the least, if they could be made to apply to purely private business. It is the right of a trader whose business is purely of a private character to trade with whom he will, and he may discriminate as he pleases. This thought was evidently in the mind of the Legislature, for it did not attempt to cover all kinds of business, and, except as to barber shops, the business referred to in the act has always been regarded as being *semi* or *quasi* public. This discussion is to show that the act is both exclusive and inclusive in character; that it does not apply to strictly private business, and that in arriving at the legislative intent and the proper interpretation of the statute we must have in mind the nature of the business which the defendant was conducting.

It appears that it was not conducting the pure food show, and had no connection therewith, save as it held a lease or concession to do certain things. If the place as conducted was one of amusement, plaintiff was not excluded therefrom, and, if she had been, neither of defendants was responsible therefor. Plaintiff was permitted all the entertainment, amusement, and instruction to which she was entitled by reason of paying her admission fee, unless the refusal of the liquid coffee in some manner interfered therewith. This, according to the allegations of the answer, was not promised her either by the Grocers' Association or by the Bell Company. She had all she was entitled to by reason of paying her admission fee, but was, of course, denied the liquid refreshments in the shape of coffee which was being served, not by the Grocers' Association, but by the concessioner. The suit is not against the Grocers' Association, but against one of its lessees, and the association did not undertake to become responsible for the

3. CIVIL RIGHTS STATUTE: construction: equal privileges: place of amusement.

conduct of any of its lessees. So that we must look at the case as it really is—one brought against a lessee of the association, a concessioner who was not responsible in any manner for the general conduct of the place, and who received no part of the admission fee. On the contrary, it paid a rental for the privilege of occupying space where the show was being conducted for the purpose of advertising its goods. We may then at once dismiss the case against the Bell Company in so far as it is brought against it upon the theory that it was conducting a place of amusement, for, in so far as the place was like a theater or other place of public amusement, it was not being conducted by the Bell Company, and in refusing to serve the coffee it did not in any way deprive plaintiff of any amusement, unless the coffee was so vile as to stimulate hilarity, and this is not claimed.

The only other question to be considered is: Was plaintiff deprived of the right to full and equal enjoyment of the accommodations, advantages, facilities, and privileges of an inn, restaurant, chophouse, eating house, lunch counter, or other place where refreshments were served? This proposition very clearly involves the rule of construction generally known as *"ejusdem generis,"* the purport of which is that, where specific words of the same nature are used in a statute followed by the use of general ones, these general terms take their meaning from the specific ones and are restricted to the same *genus;* in other words, comprehend only those things of the same kind as the specific ones. This rule is illustrated by numerous cases from almost every jurisdiction. It is enough for the purposes of this appeal to cite our own cases bearing thereon: *Keokuk v. Scroggs,* 39 Iowa, 447; *Burlington v. Leebrick,* 43 Iowa, 252; *State v. Eno,* 131 Iowa, 619; *McBride v. R. R.,* 134 Iowa, 398. This rule in no manner infringes upon that other statutory rule (Code, section 3446) found

4. SAME: "other places where refreshments are served."

in the chapter with reference to procedure in courts, to the effect that all provisions and proceedings under the Code shall be liberally construed with a view to promote its objects and assist the parties in obtaining justice. *Sandford v. Martin,* 31 Iowa, 67; *Hopkins v. Antrobus,* 120 Iowa; 24; *Witham v. Blood,* 124 Iowa, 698. The general term "all other places where refreshments are served" must be construed. It surely does not apply to a private soda fountain, a place where soft drinks are sold, or to a saloon. *Rhone v. Loomis,* 74 Minn. 204 (77 N. W. 31); *Kellar v. Koerber,* 61 Ohio St. 391 (55 N. E. 1002); *Cecil v. Green,* 161 Ill. 268 (43 N. E. 1105; 32 L. R. A. 566). Under a statute containing a specific enumeration of places, and followed by the words "and all other places of public accommodation," it was held by the New York court that a bootblacking stand was not included. *Burks v. Bosso, supra.* And in Connecticut it was held that a licensed barber shop was not a place of public accommodation. *Faulkner v. Solazzi,* 79 Conn. 541 (65 Atl. 947, 9 L. R. A. (N. S.) 601), s. c., fully annotated, in 9 *Am. & Eng Ann. Cas.* 67. See, also, *Com. v. Sylvester,* 13 Allen (Mass.) 247. In our own case of *Humburd v. Crawford,* 128 Iowa, 743, it was held that if one serves meals only in pursuance of previous arrangements, and therefore to particular individuals, rather than to any who might apply, his place is not an eating house, but a private boarding establishment, and that the civil rights statute does not apply. See, also, *Alsberg v. Lucerne Hotel Co.,* 46 Misc. Rep. 617 (92 N. Y. Supp. 851). On the other hand, a public bowling alley was held to be a place of public accommodation and amusement by an Ohio circuit court. *Johnson v. Humphrey Co.,* 24 Ohio Cir. Ct. R. 135. And in New York a skating rink to which the public was admitted for a consideration was held to be a place of amusement. *People v. King,* 110 N. Y. 418 (18 N. E. 245, 1 L. R. A. 293, 6 Am. St. Rep. 389).

These are practically all the cases bearing upon the proposition now before us, although appellant's counsel cite many others which they claim to be in point. Among these is *Ferguson v. Gies,* 82 Mich. 358 (46 N. W. 718, 9 L. R. A. 589, 21 Am. St. Rep. 576). In that case the defendant was manager of a public restaurant in the city of Detroit and held a license from the municipality to conduct such business. The statute required that full and equal accommodations should be given to all in inns, restaurants, and eating. houses. The question there was as to whether or not plaintiff in that case had been given full and equal accommodations. "136 Iowa, 136 and 137," is cited; but there is nothing in the cases there reported bearing upon the proposition now before us. *Humburd v. Crawford, supra,* is relied upon; but what is there said supports appellees' contention. In that case it is said: "The evil sought to be remedied was unjust or groundless discrimination between individuals where the public generally are invited to be served or entertained." (See *Bowlin v. Lyon,* 67 Iowa, 536.) "If, then, the object and practice of defendants was to serve meals to whomsoever applied, at prices charged to all, their place was an 'eating house' within the meaning of this statute. If meals were served only in pursuance of previous arrangements, and therefore to particular individuals, rather than to any who might apply, it was a 'private boarding house' only." *State v. Hall,* 72 Iowa, 525, was a case where defendant refused to shave one Bennett, and he was indicted under the statute guaranteeing to all full and equal enjoyments of barber shops. The indictment in the case was held insufficient, and this is all the case decides. *Bowlin v. Lyon,* 67 Iowa, 536, is a case where plaintiff, a colored man, brought action for being excluded from defendant's skating rink. The court held that no action would lie for the reason that the skating rink was not licensed, but was conducted as a purely private business.

In that case it is said:

It may be said, as a general rule, that the law does not undertake to govern or regulate the citizen in the conduct of his private business. In all matters of mere private concern he is left free to deal with whom he pleases, and to make such bargains as he is able to make with those with whom he does deal. There are, however, classes of business in the conduct and management of which, notwithstanding they may be conducted by private parties for their own emolument, the general public has ·such interest as that they are properly the subject of regulation by law, and those engaged in them are subject to restrictions and limitations which do not apply to persons engaged in other kinds of business. Innkeepers and carriers of passengers are of this class. All members of the general public are entitled to demand accommodations, if they are able to do so. If the innkeeper has room in his house, he is ·bound to receive and entertain any traveler or wayfaring person who applies for accommodations, and is able and willing to pay a reasonable consideration therefor, and whose character and conduct are unobjectionable; and the carrier is also bound to receive all members of the public who apply for accommodation, and whom he is able to accommodate. While they have the right, doubtless, to make reasonable and proper rules for the conduct of their business in which they are engaged, they are not permitted to discriminate in favor of or against any class. Nor are they at liberty to refuse accommodations to any whom they are able to accommodate. The ground upon which these restrictions are imposed is that persons engaged in these vocations are in some sense servants of the public, and in conducting their business they exercise a privilege conferred upon them by the public, and they have secured to them by the law certain privileges and rights which are not enjoyed by the members of the public generally. It may be that the manager of a place of public amusement, who carries on his business under a license granted him by the State, or by a municipal corporation organized under the laws of the State, would be subject to the same restrictions. We incline to think that he would, for, as he carries on the business under an authority conferred by

the public, the presumption is that the intention was that whatever of advantage or benefit should result to the public under it should be enjoyed by all its members alike. The power which granted the license represented each member of the public in making the grant, and each member, with reference to those privileges which accrue to the public under it, must be on an equality with every other member.

It seems to us, however, that the business conducted by the defendants was not of this character. The public has assumed no control of it, and it does not appear that it is a business in which the public have a concern. Any citizen of the State has the right to establish himself in it at his own election, and no license or authority from the public is required therefor. It seems to us that it is essentially a private business, and that it will remain so until the public assumes some control of it. Defendants were using their own property in conducting the business, and were carrying it on according to their own notions. When members of the public entered the building, they did so by permission of defendants, or under a contract with them. When they invited the members of the public to go to the place, they offered simply to extend to them permission to enter, or to contract with them for that permission. We see no reason why they might not have limited their invitation to certain individuals or classes. As the place belonged to them, and was under their exclusive control, and the business was a private business, it can not be said, we think, that any person had the right to demand admission to it. They had the right, at any time, to withdraw the invitation, either as to the general public or as to particular individuals.

*Clark v. Board of Directors,* 24 Iowa, 266, the question was the right to exclude colored children from the public schools, and involved a construction of a constitutional provision to the effect that provision should be made for the education of all the youths of the State through a system of common schools. It has no bearing upon the question now before us. Justice Wright dissented from the opinion of the majority, and his dissent has been followed by courts of other States and by the Supreme

Court of the United States in the *Jim Crow Car* cases and in cases involving the rights of negro children to attend the public schools. The celebrated case of *In re Ralph* (Morris, 1), the first one reported in our reports, is also called upon to do duty in construing our civil rights statute. That case was decided in the year 1839 and has no possible bearing upon the proposition now before us. The citation to 9 Cyc. pages 212-308, and 311, gives us no aid. There was, of course, a consideration paid by plaintiff to enable her to enter the show; but she was not in virtue thereof promised a cup of coffee in return. Neither the Grocers' Association nor the defendants promised her that, and if there were such promise it was by the Grocers' Association, and by it alone.

Now going to the allegations of the answer, it is there stated:

That the Des Moines Retail Grocers' Association was at the time in question engaged in conducting what was known as the "Pure Food Show." That in doing so, it leased to the defendant the J. H. Bell Company, a corporation, then and there represented by the defendant, F. J. Lane, a certain space in the building wherein said pure food show was conducted, which space was used and occupied by the defendant the J. H. Bell Company only for the purpose of exhibiting and advertising certain brands of coffee of which it was the vendor. That the method employed in introducing said coffee was to donate samples prepared in liquid form, as for table use, to such persons attending said pure food show as from whom, in the judgment of the defendant, business would be secured. That said Retail Grocers' Association advertised said pure food show and charged an admission fee thereto, and that all persons who presented tickets or paid the admission fee therein were admitted. That the plaintiff was duly admitted to said pure food show by ticket. That, when she presented herself at the booth of the defendant, the J. H. Bell Company, the defendant, F. J. Lane, then and there in charge of said booth, refused to serve her with a sample

of said coffee as he was serving others, though he did offer to serve her if she would take a seat.

We must accept this as true, for it is specifically alleged in the answer, that the defendant Bell Company had its booth purely for advertising purposes and to enable it to secure customers, and that it donated samples in liquid form to such persons attending the show as in its judgment would enable it to secure business. It clearly appears that the coffee was a donation for advertising purposes and to enable it to secure future trade. This being true, it could refuse to serve any person, no matter what his color, for any reason, or for no reason, and even if it gave a poor reason this would give the appellant no rights or privileges. The donation could be withheld or granted according to defendant's discretion. Manifestly defendant was not conducting an inn, a restaurant, a chophouse, an eating house, lunch counter, or anything of that kind or description, and it would be startling doctrine to announce that the civil rights act covers all gifts for advertising purposes. Many illustrations might be given to show that plaintiff's rights under this statute have not been violated. It is quite common for grocers and druggists to distribute samples of their wares for advertising purposes. Souvenirs are also given for advertising purposes both at the place of business and at public gatherings. Samples of candy are often distributed upon trains as an inducement to the care-worn traveler to buy. Surely in none of the cases could the donor be held liable under our civil rights act for failure to give to colored persons. In such cases the donor had the undoubted right to select the objects of his bounty, and might exclude all working men, all colored people, all Irishmen, all Jews, or all Adventists for reasons which to him might seem sufficient. These reasons may be based upon race or religious

5. SAME: equal privileges: race distinction.

prejudice, and yet the court would not be justified in saying that any right had been invaded.

It is true that plaintiff was invited with white people to the food show; but there was no guaranty that she would be treated alike by the concessioners who had souvenirs to give away, or who were advertising their goods for future trade purposes. It rested solely with defendants to say who they would serve, and the courts should not undertake to control such matters. The action is not for defamation, but is planted squarely on the civil rights act, and if there be no ground of recovery thereunder plaintiff's action must fall. There can be no doubt that plaintiff was humiliated; but it was one of those social humiliations which the law does not undertake to protect. It is such as is likely to befall any race or any kind or condition of men. Our social distinctions are arbitrary and sometimes extremely exasperating; but the law has no remedy for them.

After a careful consideration of the entire case based upon an ardent desire to secure to the colored race all the rights and privileges to which it is entitled, we are constrained to hold that the answer presents a full defense to plaintiff's petition in so far as it is based upon the civil rights act, and that the demurrer was properly overruled.

The judgment is therefore *affirmed*.

EVANS, C. J.—I can not concur in the majority opinion. The issue determined by the lower court arose upon plaintiff's demurrer to defendant's answer. From both petition and answer it appears that defendant Lane "was in charge of a certain booth of the Des Moines Pure Food Show." It is affirmed in the answer, however, that this "booth" was leased by J. H. Bell Company from the Des Moines Retail Grocers' Association, and that neither the defendant Lane nor J. H. Bell Company had any control over any other part of the pure food show; that they

were serving coffee at such booth simply for the purpose
of advertisement to such persons as' seemed to them prof-
itable.   This allegation furnishes the open door through
which the majority opinion permits an escape to the de-·
fendant.   It is admitted .that the service of coffee was
refused to the plaintiff because she was colored, and she
was so informed at the time.   The fact that a contract
existed between the Des Moines Retailers' Association and
J. H. Bell Company defining their mutual rights and ob-
ligations contains in it no element of a defense to this ac-
tion.   So far as the public was concerned the pure food
show was one enterprise.   The fact that many persons rep-
resenting many lines of goods participated in the enterprise
did not in any sense destroy its unity.   It was one "show,"
and not several.   Though there were many booths, they
became voluntarily a part of the greater unit.   Without
the booths there could be no "show;" and, without the
"show," there could be no booths.   The . argument of the
majority separates the defendant's booth from the larger
unit, and then holds that it was not such a place of "re-
freshment" as is contemplated 'by the statute.   If the de-
fendant is entitled to this method of dissection, and if we
may consider nothing but the *"disjecta membra"* one at
a time, then there was no pure food show, in the singular
sense.

The pure food show addressed itself to the public as
a *quasi* public exhibition.   It set its dates and collected
toll at its gates.   It necessarily consisted of its many parts.
Its methods of exhibition of pure foods naturally appealed
to the sense of taste.   Whatever may be said of the booth
of J. H. Bell Company if it had been a separate and in-
dependent entity, it seems to me that the pure food show in
its entirety partook of the character of a place of enter-
tainment and amusement as well as of a place where re-
freshments were served.   The character of the pure food

show as a whole is not considered at all in the majority opinion.

In as much as the defendant was in charge of one of the booths of the pure food show, and in as much as he was confessedly serving its accommodations and privileges indiscriminately to white people, and yet refused the same accommodation and privilege to the plaintiff solely on the ground that she was colored, it seems to me that the case comes fairly within the letter of the statute, and clearly within its spirit. I see no occasion for a lengthy discussion, nor for a consideration of authorities. The statute is simple and direct, and its spirit is too manifest to be mistaken. The majority opinion is professedly "divorced from sentiment;" but the statute is a statute of sentiment. It had its origin in sentiment and draws all its life therefrom. It does not deal with ordinary property rights. It is a form of the chivalry of the older days. It is an embodiment in statutory form of the sympathy of the dominant race for the weaker race in its struggle for the higher levels of worthy citizenship. The struggle is strennous at best. Perhaps no race that has aspired to the recognition of higher civilization has ever carried a heavier load of disadvantage. This was the situation that appealed to the framers of this statute. It was framed in language broad and comprehensive. Its manifest purpose was and is to protect this burdened race against the further burden of public discrimination and humiliation. It does not attempt to deal with social rights, nor is there any question of social rights involved in this case, nor was the humiliation of the plaintiff a mere "social humiliation." as indicated in the majority opinion.

I think the demurrer to the answer ought to have been sustained. and that the case ought to be reversed.

WEAVER, J.—I unite in the foregoing dissent.

ON PETITION FOR REHEARING.

PER CURIAM.—In a petition for a rehearing our attention is called to a statement in the opinion regarding the application of the civil rights statute to soda fountains; and it is claimed that this statement is beyond the case and should be eliminated, because not necessary to a decision of the point involved. This criticism is doubtless good, although the statement could not in any event be considered anything more than *dictum*. However, we do not wish to prejudge any matter which may be the subject of litigation in the future, and in view of the known methods now adopted by proprietors of soda fountains it is better, perhaps, to give no intimation about the application of the civil rights act to such institutions. All that was intended by the opinion was to state that in the cases cited it was held that statutes similar to our own did not apply to private soda fountains, places where soft drinks were sold, or to saloons. This is what was held in these cases, and it was not the intent of this court to do more than to so state. We are not to be understood as fully approving the cases so cited. They were referred to for the strength of the argument found in the opinions and cited as analogous cases. They did not, of course, involve pure food shows; and, as this case does not raise the question as to whether there may be discrimination by saloon keepers, or private soda fountain keepers, we have no occasion to determine that question. In this respect the opinion heretofore filed should be modified, and, as so modified, the opinion will stand.

The petition for rehearing must be, and it is, *overruled.*