TENIENTE RAFAEL MURIEL ET AL., demandantes y apelados, *v.* SALVADOR SUAZO, demandado y apelante.

Núm. 10055.—*Sometido:* Abril 14, 1950. *Resuelto:* Marzo 30, 1951.

*Juan B. Soto* y *Juan F. Soto,* abogados del apelante; *Hipólito Marcano,* abogado de los apelados.

EL JUEZ ASOCIADO SEÑOR NEGRÓN FERNÁNDEZ emitió la opinión del tribunal.

Esta es una acción civil de daños y perjuicios fundada en discrimen racial.

En la noche del 14 de agosto de 1943, los demandantes Rafael Muriel y su esposa Paula Olavarría, Rafael Pérez

García y su esposa Juanita Velázquez y Jorge Haddock y su esposa Ana Delia Cordero, llegaron al Club Esquife —sitio de negocio público en la Avenida Lutz de Santurce donde se servían comidas y se bailaba—perteneciente a y administrado por el demandado Salvador Suazo, con el propósito de comer y de participar en la fiesta que allí se celebraba. Muriel—Primer Teniente del Ejército de los Estados Unidos—y Pérez García—Capitán—vestían de uniforme.

Después de dejar sus automóviles en un sitio contiguo al club, se dirigieron todos por la escalera al salón de baile, en la planta alta, pero fueron detenidos por el portero Julio Díaz, cerca de la entrada al salón, impidiéndoles éste continuar su marcha y manifestándoles que lo sentía mucho pero que no podían entrar al club porque en dicho sitio no se permitían personas de color; que ésa era una orden del demandado que él tenía que respetar. Ante la actitud del portero, Pérez García le indicó su deseo de entrevistarse con el administrador del club para conocer las razones por las cuales no se permitía la entrada al club a personas de color. Al venir el demandado, Pérez García le informó sobre lo que les había ocurrido. El demandado ratificó lo que el portero les había dicho, reiterándoles que en su negocio él no permitía personas de color; que lo sentía mucho pero que no podía permitirles allí por ser de color. Insistió Pérez García en que les permitiera la entrada, ya que anteriormente él había estado solo en el club y que en dicha ocasión el demandado lo había aceptado, contestando Suazo que ésa era su "disposición" en el negocio. Intervino entonces Muriel, indicando a Suazo que aparentemente él ignoraba la existencia de una ley que prohibía que se le cerraran las puertas de un establecimiento público a una persona por razón de religión, color o raza. Suazo le contestó que aquél era su negocio y que el gobierno nada tenía que ver con el mismo. Al replicarle Muriel que él era un Oficial del Ejército, el

demandado le ripostó que él nada tenía que ver con el ejército, que aquél era su negocio y que las personas de color no se lo mantenían.

La discusión, que se inició tranquilamente, se tornó acalorada. Con tal motivo, muchas de las personas que estaban en el club se aglomeraron alrededor de los demandantes y el demandado, cerca del salón de baile, en la "barra". En vista de la decisión irrevocable del demandado, los demandantes bajaron las escaleras con sus esposas y se retiraron hacia sus casas. Iban contrariados y avergonzados, en estado de excitación nerviosa por la humillación pública de que habían sido objeto. Tanto la actitud del demandado como la del portero produjo en ellos gran depresión moral. Por varios meses se abstuvieron de visitar otros sitios de diversión en la Capital, temerosos de que pudiera repetirse el incidente. Era la primera vez que tal cosa les ocurría. La esposa de Muriel salió del sitio llorosa no pudiendo asistir a su trabajo al día siguiente. El propio Muriel se sentía humillado y hasta cambiado, con un complejo de inferioridad que nunca antes había sentido. Haddock, empleado del Hotel Condado, tuvo que explicarle a su jefe lo que le había sucedido en el Club Esquife.

Hasta aquí los hechos que consideró probados el juez sentenciador a quien las partes, luego de un juicio en sus méritos ante un juez interino, sometieron el caso para decisión por la transcripción de la evidencia presentada en el juicio. La demanda fué declarada con lugar, condenándose al demandado a satisfacer a cada uno de los esposos demandantes, para la sociedad de gananciales constituída por cada uno de ellos con sus respectivas esposas, por los daños y perjuicios ocasionados a cada miembro de cada sociedad, la suma de $1,000, en total $3,000, más las costas y $300 para honorarios de abogado.

No conforme el demandado apeló para ante este Tribunal y sostiene en su alegato que el tribunal inferior cometió

los siguientes errores: (1) resolver que la demanda aduce hechos constitutivos de causa de acción; (2) resolver que los maridos demandantes no reclaman para sí sino para la sociedad de gananciales; (3) resolver que los maridos demandantes reclaman para la sociedad de gananciales no sólo daños y perjuicios sufridos por cada uno de ellos sino los sufridos por sus respectivas esposas; (4). declarar probados los hechos de la demanda; (5) actuar con pasión y prejuicio al considerar y apreciar la prueba y (6) al dictar sentencia a favor de los demandantes.

Dos son los argumentos del apelante al discutir su primer señalamiento de error: (1) que la causa de acción, de existir, corresponde a la sociedad de gananciales y no a los demandantes individualmente y (2) que los daños alegados en la misma son daños morales por sufrimientos mentales y tales daños no pueden concederse a no ser que vayan acompañados de daños físicos.

██ La causa de acción por daños a uno de los cónyuges pertenece, efectivamente, a la sociedad de gananciales y la demanda debe ser radicada por el marido como administrador de la misma. *Serra v. Autoridad de Transporte*, 68 D.P.R. 626; *Valiente & Cía. v. Corte*, 68 D.P.R. 529; *Guadalupe v. Corte*, 65 D.P.R. 293; *Segarra v. Vivaldi*, 59 D.P.R. 803; *Serrano v. González*, 68 D.P.R. 623; *Rivera v. De Martínez*, 70 D.P.R. 482; *Meléndez v. Iturrondo*, 71 D.P.R. 60; *Flit v. White Star Bus Line, Inc.*, 49 D.P.R. 144 y *Vázquez v. Valdés et al.*, 28 D.P.R. 467. Pero estamos convencidos, bajo la autoridad de los casos de *Meléndez v. Iturrondo*, supra, y *Serra v. Autoridad ·de Transporte*, supra,.que si bien los maridos comparecieron en esta acción "por sí y además dando el concurso" a sus respectivas esposas, ejercitaron la causa de acción para beneficio de la sociedad conyugal—a quien pertenecía—como administradores de la misma, y no para ellos individualmente, siendo innecesario y superfluo el concurso que aparecen dando a sus res-

pectivas esposas. La reclamación de los daños no sólo se hizo alegando los sufridos por ellos individualmente, si que también los sufridos por cada una de sus esposas. No tiene razón, pues, el apelante, sobre este extremo de su primer señalamiento de error. Por idénticos motivos desestimamos también el segundo y el tercero de los errores señalados.

█ Tampoco tiene razón en lo referente a la falta de causa de acción por no alegarse daños físicos. En esta jurisdicción ha quedado definitivamente establecido el derecho a reclamar, en acciones *ex delicto*, daños y perjuicios por humillaciones y sufrimientos mentales independientemente de la existencia de daños físicos. *Rivera* v. *Rossi*, 64 D.P.R. 718; *Vélez* v. *General Motors, etc. Corporation*, 59 D.P.R. 584 y *Mejías* v. *López*, 51 D.P.R. 21. Y es bueno recordar que quizás el daño causado por una humillación como la sufrida por los demandantes en este pleito es de más importancia que muchos daños físicos. Es en el alma de los hombres —y no en el pigmento de la piel—donde se anidan las sensibilidades y los valores del espíritu, que siempre se quiebran más hondamente por el impacto de la agresión moral que por el impacto de la agresión física.

██ El apelante, sin embargo, insiste en que no procede conceder indemnización por daños morales, si los mismos no van acompañados de daños físicos cuando la causa de acción se basa en la infracción de una ley especial que dispone una penalidad por tal infracción, y que cuando un estatuto crea un derecho y prescribe un remedio por su violación, tal remedio es exclusivo.

Se trata aquí de una acción civil contra el demandado por los daños morales sufridos por los demandantes al negarles aquél acceso, servicio e igual tratamiento en su negocio público por ser ellos personas de color. La sección 1(a) de la Ley de Derechos Civiles de Puerto Rico—Ley núm. 131, aprobado el 13 de mayo de 1943, pág. 405—dispone:

"En Puerto Rico no se negará a persona alguna acceso, servicio e igual tratamiento en los sitios y negocios públicos y en

los medios de transporte por cuestiones políticas, religiosas, de raza o color o por cualquiera otra razón no aplicable a todas las personas en general."

Y la sección 2 de la misma establece:

"Toda persona que deliberadamente o mediante informes falsos o cualquier subterfugio violare cualquiera de las disposiciones de esta Ley, incurrirá en un delito menos grave (*misdemeanor*) y será castigado con una multa no menor de veinticinco (25) dólares ni mayor de cien (100) dólares, o con cárcel por un término no mayor de cien (100) días ni menor de diez (10) días, o ambas penas a discreción del tribunal."

La regla general, aun cuando hay autoridades en contrario, es que un estatuto protector de derechos civiles, no obstante contener una disposición de índole penal por su violación, no impide el ejercicio de una acción civil de daños y perjuicios, ya que el deber impuesto a las personas a quienes se aplica lo es para la protección y beneficio de otras personas, y la violación de ese deber es fuente de responsabilidad por cualquier daño causado como consecuencia de ella. *Anderson* v. *Pantages Theatre Co.*, 114 Wash. 24, 194 Pac. 813; *Bolden* v. *Grand Rapids Operating Corporation*, 239 *Mich.* 318, 214 N.W. 241; *Ferguson* v. *Gies*, 82 Mich. 358, 46 N.W. 718; 10 Am. Jur., *Civil Rights*, sección 25, pág. 918. Véase Monografía en 171 A.L.R. 920.

Si bien la Ley de Derechos Civiles de Puerto Rico hace un delito misdemeanor su violación, no es menos cierto que el propósito fundamental de la misma fué, según su exposición de motivos, consagrar en una pieza legislativa de acción dinámica—genuinamente democrática—el postulado contenido en la declaración de independencia de los Estados Unidos de América que declara: "Sostenemos como verdades evidentes que todos los hombres son creados iguales", determinando expresamente "ciertos derechos civiles fundamentales respecto al disfrute por todas las personas en general de las facilidades que ofrezcan los sitios y negocios públicos de Puerto Rico, que proteja y garantice iguales derechos para

todas las personas en Puerto Rico, y el máximo goce de los beneficios que deriven por su condición como tales los ciudadanos o residentes de Puerto Rico, irrespectivamente de diferencias de razas, credo político o religioso. . .” La Asamblea Legislativa, velando por esos principios básicos de la democracia—baluarte de la civilización, que requiere del ciudadano la más leal devoción a sus principios—quiso desalentar los discrímenes raciales y proteger al individuo en esta fase de su libertad integral, haciendo postulado legislativo lo que, por razón natural, era ya uno de los derechos humanos en la conciencia de los hombres del mundo libre. Enmienda XIV de la Constitución; artículo 2, Ley Orgánica de Puerto Rico. El estatuto, por el hecho de castigar como delito[1] la violación del derecho en él consagrado, no impide el ejercicio de la acción civil de daños y perjuicios que por tal violación, y en relación con el artículo 1802 del Código Civil, tiene una persona que sufre daño culposo. No existe, pues, el error señalado.

█ Tampoco los señalamientos de error cuarto, quinto y sexto, que se refieren a la apreciación de la prueba. Toda vez que la corte inferior resolvió el caso, según la estipulación de las partes, por las declaraciones de los testigos que declararon ante otro juez, este Tribunal está en las mismas condiciones que el tribunal inferior para apreciar los hechos que surgen del récord ante nos. *Gómez* v. *Trujillo*, 59 D.P.R. 468, 472; *Encarnación* v. *Salim*, 69 D.P.R. 766. Concurrimos con las condiciones de hecho que hizo el tribunal inferior.

*La sentencia será confirmada.*

---

[1] *Pueblo* v. *Suazo*, 63 D.P.R. 905.