ROSELLÓ HNOS., INC., demandante y apelante, *v.* JESÚS FIGUEROA, JOSÉ AGUILERA y ALEJANDRO TORRES, demandados y apelados.

Número 11165.

*Sometido:* 7 de abril de 1954. *Resuelto:* 6 de mayo de 1955.

262

*Víctor Rivera Colón,* abogado de la apelante; *Rafael Hernández Matos,* abogado de los apelados.

EL JUEZ ASOCIADO SEÑOR BELAVAL emitió la opinión del Tribunal.

Se trata de una acción de desahucio bajo las disposiciones de la Ley de Alquileres Razonables de Puerto Rico, donde el demandante alega, que interesa retirar la propiedad arrendada del mercado de alquileres de buena fe, para dedicarla

a uso propio. Negaron los demandados la buena fe del propietario en tomar tal acción, siguiendo la norma establecida en nuestra decisión anterior sobre las cuestiones de derecho planteadas previamente dentro del mismo caso: *Roselló Hnos.* v. *Figueroa*, 74 D.P.R. 432 (*Ortiz*), (1953).

Después de una vista sobre los hechos, la ilustrada Sala sentenciadora estimó probados los siguientes hechos:

"1. La corporación demandante es dueña de una propiedad en la calle Isabel de la ciudad de Ponce. En esta propiedad hay cuatro locales comerciales.

"2. Roselló Hermanos adquirió la propiedad en el año 1951.

"3. Al adquirir la propiedad la demandante los demandados ocupaban los locales que ocupan actualmente.

"4. Se les notificó a los demandados que la propiedad se retiraba del mercado de alquileres por necesitarla para su uso propio.

"5. La propiedad está compuesta de dos inmuebles distintos marcados con los números 72 y 74 de la Calle Isabel.

"6. El anterior dueño don Miguel Roselló es presidente de la corporación y era presidente de la corporación cuando se compró la propiedad.

"7. El local que actualmente ocupa la firma Roselló Hermanos es de la propiedad de doña Josefina Arce de Roselló esposa de don Guillermo Roselló, uno de los principales accionistas de la firma.

"8. El 20 de enero de 1953, la Junta de Directores de la corporación tomó un acuerdo autorizando la comparecencia del gerente para iniciar estos pleitos de desahucio. Para esa fecha ya se habían radicado las gestiones de desahucio.

"9. Antes de adquirir esta propiedad don Miguel Roselló Manresa ésta pertenecía a don Juan y don Pedro Vestal y a don Juan Labrador.

"10. Uno de los inquilinos, don Alejandro Torres, interesaba la propiedad y don Guillermo Roselló, accionista de la corporación, quien era apoderado de los anteriores dueños, se la ofreció en venta y le dió un plazo de tres días para que decidiera si la compraba o no. Torres no contestó la carta en que se le daba dicho plazo a pesar de que, según el Sr. Roselló, siempre estuvieron dispuestos a venderla.

"11. Don Miguel Roselló se trasladó a España y en 1948 le compró a los poderdantes de su hermano la tantas veces mencionada propiedad por la suma de $30,000.

"12. Estando incapacitada la esposa de don Miguel Roselló Manresa, simularon una acción sobre otorgamiento de escritura contra ella de la que desistieron y previa la autorización correspondiente la propiedad le fué traspasada a la corporación por el precio de $30,000 pagando la corporación el precio en la siguiente forma: se le expidieron acciones a nombre de don Miguel Roselló y Manresa por la suma de $20,000 y se le expidió un vale hipotecario por la diferencia de $10,000.

"13. La corporación Roselló Hermanos tiene un capital emitido de $81,000 y don Miguel Roselló Manresa tiene $51,000 en acciones, siendo por tanto, el principal accionista y teniendo asimismo el control de la corporación.

"14. Desde que don Miguel Roselló Manresa compró dicha propiedad en febrero de 1948, ha tenido dificultad con los inquilinos porque don Miguel Roselló entendía que los cánones fijados eran muy bajos y no compensaban la inversión que él había hecho en el inmueble.

"15. Entre los inquilinos que ocupaban locales en esta propiedad estaba doña Valentina Monforte de Bigas y el Sr. José Norat Rodríguez. A estas propiedades la O.P.A. le había fijado un canon de $34 mensuales y el Sr. Roselló les cobraba $60.

"16. Para la fecha en que el Sr. Miguel Roselló compró la propiedad, el inquilino Alejandro Torres Andrade respondía de los alquileres de los demás inquilinos. El Sr. Miguel Roselló le propuso que le permitiera entenderse él directamente con los otros inquilinos a lo que accedió el señor Torres Andrade.

"17. Inmediatamente el Sr. Roselló pidió un aumento de alquiler. Al Sr. Torres que pagaba $52 mensuales le subieron el canon a $98 y después de una reinvestigación del caso el canon le fué rebajado a $84. Este inquilino ha estado ocupando ese mismo local por 32 años.

"18. En relación con los demás inquilinos la situación es similar a la del señor Torres.

"19. Cuando don Miguel Roselló compró dicha propiedad lo hizo con el propósito de vivir en la planta alta del mismo.

"20. A pesar de que don Miguel Roselló alega haber comprado dicha propiedad para la corporación, no hizo el traspaso de la misma hasta 1951.

"21. Todos los inquilinos han requerido a don Miguel Roselló y a la corporación para que hagan arreglos en la planta física de la propiedad por estar la misma en pésimas condiciones, a lo que se ha negado el Sr. Roselló.

"22. La corporación demandante ocupa el mismo local desde el año 1945 y los negocios de la corporación no han tenido fluctuación alguna desde el año 1946 hasta 1950, como puede verse de los informes anuales de la corporación, no apareciendo de los mismos progreso sustancial extraordinario en el negocio de la misma. Por ejemplo, en los años 1946 y 1947 aparece del informe que la corporación tenía $59,000 en mercancía con un activo de $66,000 y en el año 1950 un activo de $58,000 y mercancía por valor de $43,000. El activo bajó $8,000, y las mercancías bajaron $16,000."

Con vista a los hechos que estimó probados, la ilustrada Sala sentenciadora concluyó como cuestión de derecho, que la demandante había actuado de mala fe, mediante el siguiente razonamiento:

"La buena fe no es una mera frase, es un requisito adicional que el demandante viene obligado a demostrar en adición a los que anteriormente se requerían. Siendo la buena fe un elemento esencial a probarse en una acción de desahucio como la del presente caso, es necesario investigar todas las circunstancias que rodeen el caso, y la cuestión de buena fe es una cuestión de hecho que habrá de inferirse por las circunstancias de cada caso en particular.

"La contención de los demandantes es en el sentido de que Roselló Hermanos nada tiene que ver con las actuaciones de Miguel Roselló y que no habiendo celebrado nunca la demandante contrato de arrendamiento alguno con los demandados y habiendo dado por terminado el que existía a la fecha en que compró la propiedad, las actuaciones de Miguel Roselló no pueden en forma alguna considerarse para determinar la buena fe o mala fe de la corporación demandante.

"Miguel Roselló, el anterior dueño, no sólo es el presidente de la corporación demandante sino que además tiene el control y es el principal accionista de la misma. Teniendo el control de más de cincuenta por ciento de las acciones evidentemente la corporación resulta ser un instrumento de su presidente Miguel Roselló. No solamente es el primer accionista y presidente

de Roselló Hermanos, sino que además es su acreedor hipotecario y los demás accionistas de la corporación son miembros de su familia.

"Aunque Miguel Roselló y Roselló Hermanos jurídicamente son dos personas distintas, Miguel Roselló y Roselló Hermanos están en tal forma vinculados que no puede desvincularse la actuación de Miguel Roselló con las actuaciones de la corporación misma en relación con los actos ejecutados por uno o por otro en tanto en cuanto respecta a las propiedades envueltas en este litigio. En este caso el propósito de desahucio surge en la mente de Miguel Roselló desde el momento en que las circunstancias de ley le impiden aumentar a su antojo los cánones de arrendamiento, desde el momento en que al hacer números la renta no cuadra con sus ambiciones de un por ciento de beneficio mayor en la inversión realizada.

"En esta misma propiedad ya hemos dicho que José Norat le había arrendado a Roselló parte del local y este señor pagó la suma de $1,560 en exceso del canon fijado por la Oficina de Administración de Inquilinato por un período de cinco años. Este pagó los $1,560 que se le exigieron en exceso por un contrato de cinco años y en esta propiedad la corporación no ha demostrado ningún interés en desahuciar, pero los demandados no se avinieron a las exigencias de Miguel Roselló y por el contrario los cánones que se habían fijado originalmente por la Oficina de Administración de Inquilinato fueron rebajados a instancias de éstos.

"Por todas las circunstancias que rodean este caso entiende el tribunal que la transacción realizada por Miguel Roselló a favor de Roselló Hermanos traspasándole la propiedad no es otra cosa que un subterfugio para darle a los demandantes la oportunidad de una causa de acción para lanzar a los demandados. Si la transacción no se hizo de buena fe y la acción de desahucio es un derecho que pueden ejercitar los demandantes a virtud de la adquisición de dicha propiedad y se hizo con ese propósito, lo que el tribunal infiere, la presente acción carece del elemento esencial de buena fe a que se refiere el Art. 12–A–7, habiéndose demostrado, contrario a la buena fe que venían obligados a demostrar mala fe. Como puede verse, la necesidad del local para ampliar el negocio en vez de haberse demostrado ha sido destruída por la propia prueba de los demandantes. Los

negocios de la corporación en vez de haber aumentado, de conformidad con los informes ofrecidos en evidencia, han disminuído."

En virtud de tales conclusiones declaró sin lugar la demanda, y la demandante ha apelado ante nos de tal pronunciamiento. En realidad de verdad lo que nos plantea es que la ilustrada Sala sentenciadora cometió error de hecho y de derecho al concluir que ella no había actuado de buena fe.

█ La Ley aplicable al caso es el art. 12 de la Ley de Alquileres Razonables de Puerto Rico, según quedó enmendado por la Ley núm. 201 de 14 de mayo de 1948 ( (1) pág. 575), que dispone: "Sea cual fuere la fecha de su edificación u ocupación, y tanto en las viviendas como en los locales de negocio, aunque cambie el dueño o el titular arrendador, llegado el día del vencimiento pactado en el contrato de arrendamiento, éste se prorrogará obligatoriamente para el arrendador y potestativamente para el inquilino o arrendatario sin alteración de ninguna de sus cláusulas todas las cuales se reputarán vigentes. Lo anterior es aplicable tanto a contratos escritos como a convenios orales y la prórroga se entenderá por los plazos que fija el artículo 1471 del Código Civil, pero nunca por un período mayor que la duración de la emergencia declarada en esta Ley. Dicha prórroga es también aplicable a solares dados en arriendo y en los cuales existen edificaciones pertenecientes a dueño distinto al del solar"; el art. 12–A según quedó enmendado por la misma Ley núm. 201 de 14 de mayo de 1948 que dispone: "Como excepciones a lo dispuesto en el artículo precedente el arrendador podrá negar la prórroga del contrato de arrendamiento y en su consecuencia promover la acción de desahucio solamente en los casos siguientes: . . . (7) Por necesitar para sí, *de buena fe*, el local de comercio o negocio. Para que prospere esta excepción será necesario que concurran las condiciones fijadas a continuación:

"*a*. Que el arrendador haya adquirido la propiedad con anterioridad al 17 de julio de 1947, fecha de vigencia de la Ley

de Alquileres Razonables en cuanto a locales comerciales y de negocio, y que el local hubiera estado arrendado por plazo fijo y ya hubiera vencido el término del arrendamiento.

*b.* Que el arrendador no tenga establecido en la misma localidad, en edificio propio o ajeno, un negocio de naturaleza igual o parecida al que tenga el inquilino.

*c.* Que el arrendador interese el local para ocuparlo personalmente con negocio de su exclusiva pertenencia.

*d.* El mero hecho de que el arrendador desea o necesite la ampliación de su negocio no será causa bastante para justificar la necesidad en que se halla de ocupar el local que hubiere dado en arriendo.

*e.* El arrendador deberá notificar por escrito en forma fehaciente al inquilino afectado la necesidad en que se halla de ocupar para sí el local, y le requerirá para que desaloje el mismo, todo ello con seis meses de antelación, por lo menos, a la fecha en que el inquilino reciba la notificación de desalojo.

*f.* Si dentro de los noventa (90) días de ser desalojado el local y sin que medie justa causa éste no fuera ocupado y abierto al público por el arrendador, el inquilino podrá obtener del arrendador la indemnización que corresponda a los daños efectivamente sufridos por razón del desalojo, suma que nunca será inferior a tres mensualidades de renta, más las costas y honorarios de abogado del demandante. Si en cualquier momento durante los doce meses siguientes a la fecha en que el arrendatario desaloje el local el arrendador la cediese o arrendare a otra persona, indemnizará al arrendatario con los daños que se le hubieren causado, los cuales se fijarán en una suma que en ningún caso será inferior de doscientos (200) dólares o de seis mensualidades de alquiler, cualquiera de estas sumas que fuere la mayor, más las costas y honorarios de abogado del demandante, según los fije el tribunal. Lo anterior es sin perjuicio de la responsabilidad fijada al arrendador en el Artículo 12–J."

En nuestras decisiones posteriores a la resolución del caso de *Rivera* v. *R. Cobián Chinea & Co., Inc.,* 181 F.2d 974, (*Maris*), (*Magruder*), hemos reconocido el derecho del dueño de un local arrendado a retirar dicho local del mercado de alquileres cuando de buena fe interese utilizar dicho local para su propio uso: *Rodríguez* v. *Álvarez,* 70 D.P.R. 977 (*Todd hijo*), (1950), cita precisa a la pág. 981; *Roselló*

*Hnos.* v. *Figueroa,* 74 D.P.R. 432 (*Ortiz*), (1953), cita precisa a la pág. 438; *Sucn. Pérez* v. *Gual,* 75 D.P.R. 385, (*Pérez Pimentel*), (1953) cita precisa a la pág. 390; *Mouriño* v. *Tribunal Superior,* 76 D.P.R. 273 (*Belaval*), (1954), cita precisa a las págs. 276 y 277; *Sucn. Pérez* v. *Gual,* 76 D.P.R. 959 (*Pérez Pimentel*), (1954).

 En cuanto a la buena fe, en el caso de *Rodríguez* v. *Álvarez,* 70 D.P.R. 981, resolvimos: "La única que aquí confrontamos es en cuanto a cuál debe ser la pauta a seguirse para determinar la buena fe del demandante. Es la propia Ley, en su artículo 12–A–7, supra, la que especifica las circunstancias que deben concurrir, las cuales deben alegarse y probarse para que la acción prospere." Tal afirmación resultaba un tanto contradictoria con lo resuelto en el caso de *Rivera* v. *R. Cobián Chinea & Co., Inc.,* 181 F.2d 974, puesto que cada una de las limitaciones impuestas por el art. 12–A–7, resultaban verdaderas restricciones al ejercicio del derecho constitucional por parte del dueño. En el caso de *Roselló Hermanos* v. *Figueroa,* supra, cita precisa a la pág. 440 armonizamos los criterios establecidos en *Álvarez* v. *Rodríguez,* supra, y en *Rivera* v. *R. Cobián Chinea & Co., Inc.,* supra, y establecimos que bastaba probar, (1) el requerimiento al inquilino con seis meses de antelación a la fecha en que el inquilino reciba la notificación de desalojo, (2) que el término del contrato estaba vencido y (3) que el dueño de la propiedad interesara de buena fe retirar la propiedad arrendada del mercado de alquileres para ocuparla con un negocio de su propiedad, para que el desahucio prosperara. En dicho caso, sin embargo, no definimos el concepto de buena fe.

Fué en el caso de *Sucn. Pérez* v. *Gual,* supra, cita precisa a la pág. 391, donde resolvimos que al demandante corresponde probar su buena fe, definiéndola como que quiere decir: "honestamente, sin fraude, colusión o engaño" y prescribiendo que la prueba demuestre "que los demandantes no hayan actuado motivados por cualquier intención que no sea

la de obtener el local para establecer su negocio" (pág. 382).
En ese mismo caso resolvimos que para concluir que el demandante ha actuado de mala fe, la prueba debe demostrar
que la causa del desahucio fué un acto de venganza contra
el inquilino, (pág. 393).

La buena fe, cuando se usa en su acepción genérica, es
una de las figuras del derecho justo (equidad) y por lo tanto
nos obliga a examinar el modo como actúa una persona con
el fin de determinar si sus actuaciones responden al concepto equitativo de la justicia como algo distinto al concepto
estricto del derecho. Es aquella limpieza en el propósito que
deja satisfecha la conciencia moral del juzgador. En el sentido en que la usa la Ley de Alquileres Razonables de Puerto
Rico no es en el concepto jurídico que dicha figura tiene en
el Código Civil de Puerto Rico, cuando se relaciona con la
posesión, la contratación o la prescripción, sino en el concepto que tiene dentro de la jurisprudencia de la equidad.
La confusión que parece existir sobre este particular proviene de la historia legislativa de nuestra Ley.

La Ley básica es la Ley 464 de 25 de abril de 1946, cuyo
único objeto fué complementar las disposiciones sobre inquilinato de la Ley de Emergencia para el Control de Precios
de 1942, aprobada por el Congreso de Estados Unidos: Ley
Pública núm. 420 de 29 de enero de 1942, 56 U. S. Statutes
at Large 23. La enmienda por adición que sufrió nuestra
Ley en virtud de la Ley núm. 415 de 14 de mayo de 1947
((1) pág. 821) no altera el propósito complementario. Es
cuando se enmienda dicha Ley 464, en virtud de las nuevas
disposiciones de la Ley núm. 201 de 14 de mayo de 1948 que
se incorporan a la misma, ciertas modalidades de la Ley de
Arrendamientos Urbanos de 31 de diciembre de 1946 de España: Medina y Marañón—Leyes Civiles de España—Leyes, Decretos, Órdenes de 1946-558 (ed. del Instituto Editorial Reus de 1949). Compárese el art. 12-12A, 12-C,
12-D, 12-E, 12-F y 12-G de la Ley de Alquileres Razonables de Puerto Rico, después de enmendada en el 1948 con

los arts. 70, 76, 149–1ª, 149–7ª, 149–2ª, 149–4ª, 149–5ª, 76, 77, 78, 776, 82, 85, 90, 90–b, 92, 90–a, 91, 76–2ª, 102–a, 102–b 103, 106, 104, 106, 71, 72, 73, 74 y 86 de la Ley de Arrendamientos Urbanos de 31 de diciembre de 1946 de España y se tendrá una bastante aproximada tabulación de las equivalencias de ambos estatutos.

En cuanto a la prueba de la buena fe se refiere, tanto el art. 12–f de la Ley núm. 464 de 1946 como el art. 12–A–7 de la Ley núm. 201 de 14 de mayo de 1948 contienen la misma exigencia. La Ley de Arrendamientos Urbanos de 31 de diciembre de 1946 de España no exige la mostración de dicha buena fe porque la excepción fija ciertas condiciones, algunas de ellas incluídas en el artículo 12–A de nuestra Ley 201, demostradas las cuales, surge el derecho del arrendador urbano al desahucio de su inquilino sin necesidad de ulterior mostración de buena fe. Como se ve, el decreto español prefirió fijar estatutariamente los elementos de la buena fe antes que dejar la indagación de esta última a las nociones de derecho justo que pudiera tener el juzgador. Nada de esto resulta inusitado en el Derecho Civil Español, pues sabido es que dicho derecho tiende siempre a definir los contenidos de cada concepto. Por el contrario el primer estatuto norteamericano que se adopta sobre el punto específico que nos ocupa,— sec. 209 (*a*) (5) de la Ley Pública núm. 464 de 30 de marzo de 1948: 62 U. S. Statutes at Large 93—, no fija estatutariamente los elementos de la buena fe, dejándola remitida a la libre indagación del juzgador.

El art. 12–A–7 de nuestra Ley núm. 201 de 14 de mayo de 1948 parece adoptar ambas tendencias: por un lado, le impone al juzgador la obligación de indagar la buena fe de la solicitud de desalojo y por el otro lado, niega la excepción a la prórroga automática a menos que concurran ciertas condiciones predeterminadas por ley. En el primer caso que resolvimos después de la enmienda del 1948, *Rodríguez* v. *Álvarez*, 70 D.P.R. 977, (1950), adoptamos el criterio que la propia Ley especificaba las circunstancias que debían concu-

rrir para determinar la buena fe del demandante. Después de la decisión de *Rivera* v. *R. Cobián Chinea & Co. Inc.*, 181 F.2d 974 (1950) nos vimos obligados a resolver que las condiciones predeterminadas por Ley constituían "limitaciones y restricciones adicionales al ejercicio del derecho constitucional del propietario a desahuciar al inquilino cuando el propósito bona fide del dueño sea... el de retirar la propiedad del mercado de alquileres para dedicarlo a su propio uso". Hoy no tenemos más remedio que concluir que la indagación de buena fe requerida por el art. 12–A–7 de nuestra Ley de Alquileres Razonables es la buena fe reconocida por la jurisprudencia de equidad: *Sucn. Pérez* v. *Gual*, supra.

La demandante y apelante nos somete la proposición que apliquemos la presunción de buena fe establecida en el art. 364 del Código Civil de Puerto Rico. Tal aplicación no es posible, según ya hemos visto. La buena fe, establecida como un requisito para el desalojo del inquilino, debe ser probada por el demandante. De acuerdo con la jurisprudencia de la equidad la demandante y apelante debe dejar convencido al juzgador que el único propósito que la anima es la de obtener el local arrendado para uso de su propio negocio y no para obtener el desalojo de su inquilino. Se trata pues de una prueba de intención que debe ser inferida de todas las circunstancias que rodean al contrato de inquilinato, y comprende la conducta anterior y posterior a la solicitud de desalojo de las partes envueltas. Como en todo caso donde sea necesario establecer prueba de intención los tribunales deben ser liberales en la recepción de la evidencia, aunque procurando siempre que la relación de causa y efecto quede establecida en la conclusión de hecho o de derecho, en tal forma que la indagación intencional no resulte demasiado remota o improbable.

■■ La demandante y apelante trata de convencernos que la prueba de tal buena fe constituye: "una verdadera limitación al derecho constitucional del dueño de un inmueble para ocupar su propiedad'. No hay tal cosa. Ni la Constitución Federal de Estados Unidos: *Buchanan* v. *Warley*, 245

U. S. 60, 62 L. ed. 149 (*Day*), (1927), cita precisa a las págs. 74–75 U. S. 161 L. ed.; *Block* v. *Hirsh*, 256 U. S. 135, 65 L. ed. 865, (*Holmes*), (1921), cita precisa a las págs. 155–156 U. S. 870–871 L. ed.; *Nebbia* v. *New York*, 291 U. S. 502, 78 L. ed. 940, (*Roberts*), (1934), cita precisa a la pág. 523 U. S. 948 L. ed.; *Morehead* v. *New York ex Rel Tipaldo* 298 U. S. 587, 80 L. ed. 1347, (*Butler*), (1936), cita precisa a las págs. 628 U. S., 1364 L. ed.; *Woods* v. *Miller*, 333 U. S. 138, 92 L. ed. 596, (*Douglas*), (1948), cita precisa a la pág. 146 U. S., 603 L. ed.; ni la Constitución del Estado Libre Asociado de Puerto Rico, ni el art. 280 del Código Civil de Puerto Rico, han reconocido el derecho de propiedad como un derecho absoluto, sino limitado y por lo tanto sujeto a reglamentación en favor del bienestar público. Durante todo el debate sobre la constitucionalidad, tanto de la Ley de Emergencia para el Control de Precios de 1942 del Congreso de Estados Unidos; *Bowles* v. *Willingham*, 321 U. S. 503, 88 L. ed. 892 (*Douglas*), (1944), como de la Ley de Viviendas y Rentas del 1947 del Congreso de Estados Unidos, *Woods* v. *Miller*, 333 U. S. 138, 92 L. ed. 596 (*Douglas*) (1948), como de la Ley de Viviendas y Rentas de 1949 del Congreso de Estados Unidos, *Woods* v. *Durr*, 176 F.2d 273, (*Maris*), (1949), como de la Ley de Alquileres Razonables de Puerto Rico del 1946, *Rivera* v. *R. Cobián Chinea & Co.*, 181 F.2d 974 (*Maris*), (1950), como de la Ley de Alquileres Razonables de Puerto Rico de 1948, casos de Puerto Rico, arriba citados, nunca se ha sugerido la posibilidad que el dueño de la propiedad arrendada tenga un derecho absoluto de retirarse, aunque sea de mala fe, del mercado de alquileres. Tal conducta estaría en abierto conflicto con la declaración de emergencia contenida en la Ley de Alquileres Razonables de Puerto Rico y con el poder de guerra del Congreso de los Estados Unidos. Además estaría en abierto conflicto con el control que sobre los remedios mantiene el Estado en cualquier crisis nacional: *Home Building & Loan Association* v. *Blaisdell*, 290 U. S. 398,

78 L. ed. 413, (*Hughes*), (1934), cita precisa a las págs. 440–444 U. S. 430–432 L. ed.

La confusión parece provenir de la sec. 4 (*d*) de la Ley de Emergencia para el Control de Precios del 1942 del Congreso de Estados Unidos que disponía: "nada en esta Ley se entenderá como que exija de una persona vender cualquier servicio u ofrecer cualesquiera dependencias en alquiler"; también de la sec. 302 de la Ley de Viviendas y Rentas del 1948 del Congreso de los Estados Unidos que disponía: "nada en esta Ley o en la Ley de Viviendas y Rentas del 1947 según enmendada se entenderá como que exija de una persona ofrecer cualesquiera dependencias en el alquiler." Para obtener el significado correcto de lo que el Congreso de Estados Unidos tenía en mente al adoptar dicha disposición, nos bastaría referirnos al informe del Senador Cain en la sesión del 20 de febrero de 1948 del Congreso de los Estados Unidos—94 Congressional Record—Part Two 1458: "...Además, cito la experiencia de un hombre llamado Fliss, quien era dueño y explotaba algunos apartamientos en la ciudad de Chicago. Fuí informado que él no estaba en condición económica para llevar a cabo ciertas reparaciones en la calefacción del establecimiento, y por ello en abril de 1947, notificó a sus inquilinos, que después de octubre de este año, no les cobraría más rentas. A su debido tiempo el señor Fliss fué notificado de un interdicto mandatario obtenido en una Corte Federal por el Acelerador de Viviendas, donde se le requería que arreglara la calefacción. Por no haber podido llevar a cabo lo que se le ordenó, fué citado por desacato, y sentenciado a prisión hasta que cumpliera con el interdicto mandatario. El resultado neto de esta situación es que un arrendador puede ser compelido a permanecer en el negocio de alquileres a pesar de sus deseos de retirarse de este negocio. Aunque para los fines de esta Ley al arrendador se le considera como una persona dedicada a una empresa de utilidad pública, tal como se aplica la Ley de 1947, no se le garantiza ni siquiera la oportunidad de obtener una ganancia razonable. Las secs. 205 y 302 son

para remediar esta situación y permitir a un arrendador, *que de buena fe interesa recobrar la posesión de su propiedad,* retirarse del mercado de alquileres, disponiendo además que no queda obligado a seguir ofreciéndola en alquiler."

Como se ve, lo que estas dos disposiciones trataron de resolver fué consagrar el derecho del arrendador de retirarse del mercado de alquileres, cuando de buena fe interese no continuar en el negocio de alquileres. Las razones que pueda tener un casero para no quedar obligado a seguir ofreciendo su propiedad en alquiler pueden ser varias, pero todas están sujetas a la indagación de su buena fe. Para enfrentarse con la mayoría de las objeciones que pudiera tener un casero para no continuar en el mercado de alquileres, el Congreso de Estados Unidos después del 1942, adoptó un sistema de incentivos económicos que comprendía las siguientes medidas: (1) ajuste de rentas de acuerdo con las nuevas realidades contributivas e inversionales; (2) el descontrol progresivo de ciertas zonas donde no fuera necesaria la congelación de precios; (3) el estímulo gubernamental a un plan de viviendas en grande escala que no estuviera sujeto a la congelación de precios. La misma política adoptó la Asamblea Legislativa de Puerto Rico.

■■ Aunque las conclusiones factuales sobre la prueba de intención se consideran conclusiones mixtas de hecho y de derecho, o conclusiones de derecho escuetamente, y por lo tanto, no son obligatorias para el Tribunal de apelación, estamos conformes con las conclusiones sobre las cuales basó su inferencia de mala fe el ilustrado juez sentenciador. Basta considerar que mientras, por un lado, la arrendadora le pide a los inquilinos demandados que resistieron sus demandas de sobreprecio que desocupen el local por necesitarlo para su negocio, por otro lado, concierta un contrato por cinco años con otro inquilino no demandado, cobrándole por anticipado el sobreprecio por la totalidad del término del contrato, para darnos cuenta que tal conducta no puede dejar satisfecha la conciencia moral del juzgador.

*Debe confirmarse la sentencia apelada.*

El Juez Asociado señor Sifre está conforme con el resultado.