HÉCTOR MARTÍNEZ, demandante y apelado, *v.* DR. FRANCISCO LLAVAT ET AL., demandados y apelantes.

Número: 12747      Resuelto: 18 de octubre de 1962

*José E. Sabater,* abogado de los apelantes; *E. Alcaraz Casablanca,* abogado del apelado.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

Se apela de una sentencia dictada por la Sala de Mayagüez del Tribunal Superior que concedió daños y perjuicios basados en los hechos siguientes, incuestionablemente sostenidos por el récord:

En el mes de enero de 1957 el demandante ocupaba bajo arrendamiento verbal de mes a mes un local de negocio en un edificio propiedad de los demandados, sito en la esquina de las calles Libertad y Muñoz Rivera de Mayagüez. Hasta noviembre de 1956 había pagado $60 de alquiler pero por disposición de la Oficina de Estabilización Económica el canon quedó rebajado a $38.70 mensuales.[1]

En enero 24 de 1957 el arrendador por medio de abogado requirió por escrito al demandante para que desalojara el

---

[1] El demandante declaró que al pagarle este canon el arrendador le dijo que no estaba de acuerdo en rebajarles la casa y que lo que tenían que hacer era mudarse en seguida.

local en el término de seis meses, expresándole que el edificio estaba en malas condiciones de conservación y había decidido demolerlo para reconstruirlo y habilitar en su lugar un almacén; y que el requerimiento se fundaba en el apartado 8 del artículo 12 de la Ley 464 de 1946 de Alquileres Razonables. Que en virtud de la reconstrucción se harían locales más amplios lo cual era necesario en beneficio de sus intereses. Se advirtió al demandante que de no mudarse en el término de seis meses se radicaría la correspondiente demanda de desahucio. Como consecuencia de ese requerimiento el demandante desalojó a fines de febrero de 1957 y mudó el negocio a otro local en el que pagaba un canon de $75 mensuales.(²) La obra a realizarse según concluyó la Sala sentenciadora y demuestra el récord consistía en eliminar dos paredes interiores de ladrillo, arreglar los techos, ponerle losetas al piso de hormigón, la eliminación de un alero que cubría la acera ya deteriorado sustituyéndolo con una puerta central y dos vidrieras, una a cada lado, en lugar de la fachada de tres puertas existente. No se demolerían ni se alterarían las paredes exteriores. El edificio estaba dividido en tres locales comerciales. Como consecuencia de la reconstrucción quedaría un solo local cubriendo toda la planta. El plano correspondiente aparece fechado 17 de febrero de 1957.

El edificio quedó desocupado en febrero, 1957. El 3 de mayo, en vista de que habían transcurrido más de dos meses desde que se desocupó el edificio sin que se iniciaran las obras, el demandante requirió al arrendador por escrito para que volviese a alquilarle el local que ocupaba, requerimiento éste que no fue contestado. Antes, en 4 de marzo, el demandante había pedido por escrito al arrendador que le informara cuándo estaría terminada la reparación ya que interesaba

---

(²) El récord demuestra que a los pocos días del requerimiento el arrendador y un ingeniero fueron a medir, y se le dio a entender al demandante que los trabajos comenzarían pronto. El demandante se apresuró a buscar nuevo acomodo en vista de que tenía bastante mercancía.

obtener su antiguo local porque en el nuevo estaba sufriendo pérdidas en su negocio. A esta carta el abogado del arrendador contestó en marzo 6 que "esa parte de la ley que permitía anteriormente ocupar de nuevo el local o parte del mismo, ha sido derogada y declarada anticonstitucional, primero por una sentencia del Tribunal de Circuito de Boston y segundo por corroboración que hiciera el Tribunal Supremo de Puerto Rico"; y le recomendaba tomar nota de esa situación para que siguiera ocupando el local al cual se había mudado o buscara el mejor sitio que le acomodara a sus intereses. Para esa misma época, en mayo de 1957, el arrendador alquiló parte del edificio desocupado a un nuevo inquilino que costeó de inmediato y pagó por la reparación hecha al edificio en la parte que se le arrendó. Un año más tarde, a la fecha en que se celebraba el juicio de este caso ante la Sala sentenciadora, en el resto del edificio no se había realizado obra alguna.

El arrendador adujo durante el juicio como razón para no haber efectuado la obra la falta de recursos, alegando que por haber sido heredada la propiedad por su esposa, y no haberse liquidado la contribución sobre herencia, había estado impedido de levantar los fondos necesarios. Sobre este particular la prueba en autos demuestra que la demandada Mariana Cristy había sido declarada única heredera de su señora madre en 21 de junio de 1955; que la declaración de herencia se presentó tardíamente y la contribución se pagó en abril de 1958, y la propiedad se inscribió el 2 de mayo de ese año. El arrendador declaró que ellos eran dueños de un gran número de otras propiedades, que pasaban de veinte, muchas de ellas libres de gravámenes.(³)

---

(³) La declaración en corte del arrendador, a preguntas del demandante, fue en parte también así:

"Doctor, ¿no podría usted explicar por qué razón cuando el demandante Martínez le requirió a usted para que le devolviera el local, si no lo iba a reparar usted, no contestó?—Eso es cuestión de mi abogado, porque yo le entregué la carta a mi abogado. . . . Desde el momento cuando él empezó esta cuestión y cuando él lo requirió para que desalojara el

Concluyó la Sala sentenciadora que como consecuencia de haber tenido que desalojar el local, situado frente a la plaza del mercado de Mayagüez, y habilitar un nuevo sitio, el demandante había incurrido en los siguientes gastos extraordinarios: (1) Costo de mudanza $35; (2) cortina para proteger ventanas $100; (3) instalación eléctrica $56.14; (4) rótulos de anuncio $25; (5) gastos misceláneos $156;

local, cuando en marzo él le escribió y en mayo él le escribió, ¿usted sabía que no podía reparar el local?—Yo no sabía, porque yo dependía del Gobierno de Puerto Rico para que dejara la propiedad para poderla reparar. ¿Por qué usted dependía de eso?—Para poder levantar fondos para repararla. ¿Usted no podía levantar fondos por ningún otro medio?—Por ningún otro medio porque yo no iba a gravar otra propiedad. ¿Lo que pasa es que usted no quería hacerlo en esa forma—Esa es mi norma. . . . ¿Cómo usted después de mayo de mil novecientos cincuenta y siete lo arrendó a Pedro Javier Boscio?—El edificio, parte se reconstruyó. . . . ¿Usted no dijo que la reparación la hizo Pedro Javier Boscio?—Sí, él la costeó de acuerdo con el contrato. ¿Ya estaba arrendado a él?—No, señor. Se hizo el contrato de arrendamiento para que él la costeara. . . . Sin embargo cuando el demandante Martínez le requirió a usted para que le devolviera el local usted tan siquiera le contestó.—No tenía que contestarle. ¿Usted no lo quería allí dentro aunque él estuviera dispuesto a repararlo?—Bueno, es que nunca me hizo ninguna proposición de él reparar el edificio. . . . Doctor, ¿cómo van a tumbar todas esas divisiones enteras con Pedro Javier Boscio ahí?—No tiene que ver nada Javier Boscio. ¿En este plano aparece en otra forma?—Si, señor, porque eso fue tentativo. Lo único que hay que tumbar es esto de aquí. ¿Estos planos no están tal como se van a hacer ahora? ¿Ahí se ha variado?—No, porque eso se hizo ya parte. . . . ¿Cuando en enero de mil novecientos cincuenta y siete usted requirió a Martínez para que se fuera, ¿usted todavía no sabía cuándo iba a recibir eso?—No. Si lo hubiera sabido la hubiera pagado inmediatamente y hubiera reconstruido el local. Podía haber levantado fondos en esa fecha para reconstruir el local.

LA CORTE: ¿Cuáles son los planes suyos en cuanto a esta obra actualmente?—Reconstruir inmediatamente porque ya yo he hecho arreglos con el Banco que me va a facilitar el dinero.

[Demandante] ¿Le van a dar el dinero con garantía de esta propiedad antes de construirla?—Usted sabe que hoy en día se hacen los préstamos para reconstrucción. Dentro de ese plan me van a dar el dinero para reconstruirla. Ahora, si el caballero Martínez está dispuesto a hacer el mismo negocio que hizo Pedro Javier Boscio, yo encantado. [Dnte.] No puede. Como cuestión de realidad, cuando usted le requirió para que se fuera él lo requirió que le devolviera el local, ¿usted no estaba en condiciones de repararlo?—No, señor, no, porque no habían informado la

(6) Aumento de alquiler $544.50. (⁴) En adición a esas partidas que montan a $916.64 la Sala sentenciadora determinó que como consecuencia del cambio de local hubo merma en el negocio sufriendo el demandante además las naturales angustias, y concedió por tal concepto una indemnización adicional de $1,000. (⁵)

En derecho concluyó la Sala sentenciadora que la indemnización estatutaria que dispone el inciso 8(e) del Art. 12-A de la Ley 464 no era aplicable porque al demandante no se le devolvió el local; y habiendo actuado los demandados de manera ilegal y delictuosa, eran responsables al demandante de todos los daños causados bajo el Art. 1802 del Código Civil.

Los demandados señalan en este recurso como errores cometidos por la Sala sentenciadora: (1) el negarse a resolver que la restricción que se le impone al arrendador por medio de la presente acción es anticonstitucional; (2) el negarse a declarar que la Ley de Alquileres Razonables es anticonstitucional debido a la no existencia de un estado de guerra; (3) el negarse a aceptar que la medida de indemnización en este caso, si procediere, está fijada en la ley; (4) el imponer a los demandados una indemnización en términos generales cuando la ley no permite una indemnización diferente; y (5) el imponer a los demandados una indemnización habiendo éstos obrado de buena fe y no poder levantar fondos para

cuestión de la herencia . . . ¿Entonces vino a estar listo para poder comenzar a reparar cuando se hizo la inscripción en el Registro el veintinueve de abril de mil novecientos cincuenta y ocho?—Exacto. ¿En esa época usted vino a estar listo?—Cuando yo pagué el treinta y uno de mayo de mil novecientos cincuenta y ocho, sí, señor."

(¹) El aumento de alquiler fue calculado por la Sala sentenciadora a base de la diferencia entre el alquiler de $38.70 que hubiera pagado en el local que ocupaba y el canon de $75 en el nuevo local durante un período de 15 meses hasta que el demandante traspasó el negocio a la madre.

(⁵) El demandante declaró sin ser desvirtuado que su negocio frente a la plaza de mercado era principalmente de ventas de cierto tipo de ropa a la gente del campo que venía al mercado. El nuevo local era muy poco concurrido y su negocio se arruinó.

sufragar los gastos de la reconstrucción por impedírselo la ley sobre el pago de la contribución de herencia.

Veamos el derecho aplicable. Los artículos 12 y 12-A de la Ley de Alquileres Razonables, Ley 464 de 25 de abril de 1946—17 L.P.R.A. (ed. 1961) secs. 192, 193, —disponen que "sea cual fuere la fecha de su edificación u ocupación y tanto en las viviendas como en los locales de negocio, . . . llegado el día del vencimiento pactado en el contrato de arrendamiento, éste se prorrogará obligatoriamente para el arrendador y potestativamente para el inquilino o arrendatario, sin alteración de ninguna de sus cláusulas, . . . Como excepciones a lo anteriormente dispuesto, el arrendador podrá negar la prórroga del contrato de arrendamiento y en su consecuencia promover la acción de desahucio en los siguientes casos: [Art. 12-A]

"(8) Por proyectar el arrendador la demolición total o parcial del edificio arrendado para construir un nuevo edificio. Deberán concurrir los siguientes requisitos:

a—Que, por la naturaleza de las obras a realizarse, sea imposible llevar éstas a efecto con el inquilino en ocupación.

b—    .        .        .        .        .        .        .

c—Que los planos para la nueva construcción hayan sido aprobados por las autoridades correspondientes, y que se haya concedido el permiso para la edificación.

d—Que con 6 meses de antelación, por lo menos, a la fecha en que se proponga comenzar la obra, el arrendador notifique por escrito al arrendatario afectado en forma fehaciente para que desaloje el local por razón de las obras a efectuarse. . ."

Dispone también el inciso 8 del Art. 12-A en su apartado (e) que dentro de los dos meses a contar del día en que quede totalmente desalojado el inmueble, deberán iniciarse las obras de demolición y construcción. Transcurrido este plazo sin empezarlas, todos los arrendatarios podrán volver al inmue-

ble, sin obligación de pago de las mensualidades transcurridas, y tendrán derecho a que se les indemnice por el arrendador con el importe de seis mensualidades de renta, siempre que permanezcan allí por un período mínimo de un año.

El apartado (f) de dicho inciso 8 estatuye que el arrendador podrá retener para uso propio en el inmueble reedificado no más de un local de comercio, y los otros locales disponibles serán arrendados, atendiendo a su orden de antigüedad a los arrendatarios que fueron desalojados de sus antiguos locales que desearen volver al inmueble.(⁶)    A este respecto el apartado (g) que le sigue dispone que antes de que desalojen el inmueble, los arrendatarios que queden protegidos por el apartado (f) suscribirán documentos con el arrendador consignando la extensión superficial, su localización exacta dentro del inmueble, renta, servicios y equipos, tanto de los locales que ocupaban antes del desalojo como los que habrían de ocupar en el inmueble reedificado, y que dichos documentos harán referencia a los planos y documentos levantados para la nueva edificación y deberán ser unidos a los mismos al ser sometidos a la autoridad que los apruebe, en cuyas oficinas quedarán archivados para constancia oficial.

En relación con el inciso 8(e) del Art. 12-A dispone el Art. 12-J adicionado a la Ley de Alquileres Razonables por la Ley 201 de 14 de mayo de 1948, que el arrendador que consiguiere que su inquilino *desaloje* una vivienda o local de negocio, por la vía judicial *o en otra forma*, por medio de engaño, amenaza o violencia, *o anuncio de alguna acción judicial;* . . . o que no comience, *sin justa causa*, dentro de los dos meses de haber quedado desalojado el inmueble, las obras a que se refiere el inciso 8(d) del Art. 12-A; . . . incurrirá en delito menos grave y, convicto que fuere, será castigado con multa no menor, etc. . . .

---

(⁶) El récord no demuestra que el arrendador en este caso deseare todo el edificio o local alguno para sí.   Demuestra todo lo contrario.

El planteamiento fundamental de este caso es el de si ante los hechos en el récord a tenor de la Ley de Alquileres Razonables, procede o no en derecho conceder una indemnización de tipo general como la aquí dispuesta. El problema se dejó ver en *Pagán* v. *Caballero*, 68 D.P.R. 293 (1948), aunque no se resolvió, decisión hoy de valor punto menos que histórico, si bien en cierto respecto se relaciona con la cuestión en litigio. Se trataba, como ahora, de una acción general de daños y perjuicios. El inquilino desalojó una vivienda a requerimiento del arrendador quien alegó que la necesitaba para usarla como su residencia. Éste nunca fijó ahí la residencia sino que vendió la propiedad. Se pidió daños a base de que el arrendador burló el derecho del inquilino a seguir ocupando la propiedad arrendada. Sostuvimos que durante el período ahí envuelto, la legislación federal de inquilinato prohibía el control local de alquileres, y que bajo dicha legislación, única aplicable, no se concedía a un inquilino tipo alguno de daño por deshaucio mediante motivos falsos. Resolvimos desestimando la acción.

Sin embargo, considerando que a partir de julio 1, 1947 la legislación federal no impedía el control local de alquileres, llamamos la atención a que el anterior Art. 12(f) de la Ley 464 proveía la institución de un pleito de daños por un inquilino en ciertas circunstancias.[7] Y dijimos entonces que asumiendo la validez del Art. 12(f) un inquilino tenía causa de acción solamente si el propietario ilegalmente *lo desahuciaba* por medio de procedimientos judiciales. Un

---

[7] El anterior Art. 12(f) según fue enmendado por la Ley 36 de 22 de julio de 1947 disponía que el propietario que *obtuviera un desahucio* bajo la alegación de que procuraba el inmueble arrendado para fijar en él su residencia, con el propósito de burlar el derecho del inquilino a seguir ocupando el inmueble, si no fijaba su residencia en dicho inmueble dentro de 30 días . . . o si lo cedía en arrendamiento a otro . . . incurriría en delito menos grave . . . *disponiéndose, que en cualquiera de esos casos, el inquilino afectado tendría derecho a que el propietario le indemnizara los daños y perjuicios que se le causaren, en una suma en ningún caso menor de $100 o de tres veces el importe del canon mensual, lo que fuere mayor, más las costas, etc.* . . .

inquilino que desocupó antes de un pleito de desahucio contra él basado en motivos falsos, pero bajo amenaza de dicho pleito, vendría obligado a radicar su pleito solo bajo el Art. 1802 del Código Civil *que podía o no proveer* la causa de acción. Y que en vista de la incertidumbre en cuanto a la aplicación del Art. 1802, la Legislatura, que estaba en sesión, podría desear dejar resuelto el punto ampliando los términos del Art. 12(f) para incluir no sólo los inquilinos desahuciados mediante acción judicial si que también aquellos que desocuparan bajo amenaza de tal acción. ■

El Art. 12(f) según rezaba desapareció. Pero en el Art. 12-J adicionado después, la Legislatura en parte oyó la sugerencia al castigar al propietario que consiguiese el desalojo, por la vía judicial *o en otra forma*, por medio de engaño, amenaza, o violencia, *o anuncio de alguna acción judicial*. El otro aspecto del problema ha quedado en pie. Antes, por el contrario, el Art. 12-J no menciona aquella indemnización de daños mencionada en el anterior Art. 12(f), aunque limitada a $100 o tres meses el canon mensual. Hay que acudir entonces a los principios generales. ■

Apreciando la prueba en el récord de manera muy favorable a los demandados, partimos de la base y asumimos que en este caso se trataba propiamente de las obras de demolición total o parcial del edificio arrendado para construir un nuevo edificio u obras de reedificación, a que se refiere el inciso (8) del Art. 12-A. Cfr: *Rodríguez* v. *Corte*, 69 D.P.R. 543; *Rivera* v. *Cobián Chinea y Co.*, 68 D.P.R. 571. Distinto a los incisos (6) y (7) que le preceden, en el inciso (8) el Legislador no se refirió de manera expresa al elemento de buena fe por parte del arrendador al exigir el desalojo del inquilino. No obstante, este elemento de buena fe en el concepto de la Ley de Alquileres Razonables, —proceder "honestamente sin fraude, colusión o engaño" como se dijera en *Sucn. Pérez* v. *Gual*, 75 D.P.R. 385, 391; o en el concepto de la figura del derecho justo, equidad, "aquella limpieza en el propósito que deja satisfecha la conciencia moral del juz-

gador" que se dice más tarde en *Roselló Hnos.* v. *Figueroa,* 78 D.P.R. 261, 270, —no está totalmente ausente en el inciso (8). Se filtra a través de los distintos apartados del (a) al (h) de dicho inciso. ■■■

Justipreciada la prueba en el récord a la luz de esas consideraciones de derecho, surge sin lugar a dudas que aun cuando se dijera que hubo buena fe por parte del arrendador en el plan de desalojo, hubo de su parte un sustancial menosprecio de los requisitos y exigencias del inciso (8) en sus diversos apartados aplicables al caso, que burló el derecho del demandante a seguir ocupando el local contra la protección que a tal derecho da una legislación que por razones de orden público ha convertido al inquilino en pupilo del Estado. La Sala sentenciadora concluyó, y el récord así lo sostiene a la luz de los requisitos que deben concurrir bajo el inciso (8), que el arrendador no tenía base ni estaba justificado para requerir el desalojo del demandante cuando lo hizo. Menos justificado estuvo y actuó en incumplimiento de la ley al desoir el requerimiento del demandante para que se le devolviera el local al no comenzarse las obras dentro de dos meses. A ese efecto, y a los efectos del Art. 12-J, las razones dadas por el arrendador una vez que hubo requerido el desalojo no constituyen una justa causa. La Sala sentenciadora concluyó también, correctamente, que el tipo de indemnización provisto en el apartado (e) del inciso (8) no era aplicable en este caso por cuanto el arrendador no devolvió el local cuando se lo requirió el inquilino. Como surge del texto tal indemnización está sujeta a que el inquilino sea permitido de nuevo en el local, y permanezca allí por un período mínimo de un año. ■

A tenor de los hechos en el récord y de lo preceptuado en el Art. 12-C, el arrendador actuó culposamente. La Ley especial de Alquileres contiene ciertos conceptos de indemnización estatutaria. En lo que respecta al inciso (8), sólo se menciona la del apartado (e), que hemos dicho no rige en el caso. No se trata aquí de culpa o responsabilidad con-

tractual, porque si bien las relaciones del demandante y los demandados surgen en el origen de un contrato de arrendamiento, los hechos perjudiciales al demandante que motivan el pleito no lo fueron en su incumplimiento, sino en incumplimiento culposo de disposiciones de la Ley de Alquileres que garantizan el derecho del inquilino. ▮

Por otra parte, el hecho de que la Ley de Alquileres Razonables no disponga de manera expresa una indemnización por los actos culposos del arrendador no quiere decir, en ausencia de disposición en ella en contrario, que no quepa indemnizar si tales actos causaron daño. El Art. 12 del Código Civil (ed. 1930) estatuye que en las materias que se rijan por leyes especiales, las deficiencias de éstas se suplirán por las disposiciones de dicho Código. Cfr: *Galiñanes Hnos.* v. *Tribunal Superior,* 77 D.P.R. 881, 888; *Fuentes* v. *Srio. de Hacienda,* 85 D.P.R. 492 (1962) ; *Robles Menéndez* v. *Tribunal Superior,* 85 D.P.R. 665 (1962) Así, los demandados vienen obligados a responder al demandante en los daños causados por los actos suyos culposos que surgen del récord, bajo los Arts. 1042, 1045 y 1802 del Código Civil.[8]   Cfr: *Zalduondo* v. *Sánchez,* 15 D.P.R. 231; *Díaz* v. *San Juan L. & T. Co.,* 17 D.P.R. 69; *Guzmán* v. *Vidal,* 19 D.P.R. 841; *Torres* v. *Sucn. Córdova,* 31 D.P.R. 897; *Mejías* v. *López,* 51 D.P.R. 21; *Reyes* v. *Aponte,* 60 D.P.R. 890; *Ramírez* v. *Morales,* 69 D.P.R. 703, 706; *Muriel* v. *Suazo,* 72 D.P.R. 370, 376; *Hernández* v. *Fournier,* 80 D.P.R. 93.   Véanse por analogía, Sentencias del Tribu-

---

[8] *Art. 1042.*—Las obligaciones nacen de la ley, de los contratos y cuasi contratos, y de los actos y omisiones ilícitos o en que intervenga *cualquier género de culpa* o negligencia.

*Art. 1045.*—Las obligaciones civiles nacidas de los delitos o faltas se regirán por las disposiciones de este Código.

*Art. 1802.*—El que por acción u omisión causa daño a otro, interviniendo *culpa* o negligencia, está obligado a reparar el daño causado.

El Art. 2 del Código de Enjuiciamiento Civil (ed. 1933) dispone que cuando la violación de un derecho permite el ejercicio de ambas acciones, la civil y la criminal, el derecho de ejercer la una no impide el derecho de ejercer la otra.

nal Supremo de España de 14 de octubre de 1944, 27 de enero y 12 de febrero de 1952 y 20 de octubre de 1954. En esta última, anulando la sentencia recurrida que negó daños bajo el Art. 1902 (1802 nuestro) como consecuencia de una ejecución de bienes obtenida estando vigente una moratoria decretada por el gobierno, dijo el Tribunal: . . . "mas este razonamiento carece de eficacia por cuanto si el actor hizo al Juzgado de Primera Instancia las peticiones conducentes a obtener en el juicio ejecutivo iniciado el año 1935 la subasta de los bienes embargados y por no existir licitadores en el remate logró la adjudicación de los bienes precisamente vigente la moratoria acordada el año 1938, esas peticiones y resoluciones implicaban una transgresión legal, con violación del artículo 4.º del Código Civil de manifiesto orden público, que si bien no fue advertida por el Juzgado de Primera Instancia, ello no implica, aparte de otra índole de responsabilidad, la liberación de culpa del entonces demandante, quien al instar las diligencias citadas obró de manera culposa, pues, en realidad, el hoy recurrido más bien que utilizar un derecho lo infringía abiertamente conculcando los derechos de la parte contraria protegidos por la moratoria concedida en atención a las circunstancias de índole general en que se hallaba España a consecuencia de la Guerra de Liberación, causando perjuicios manifiestos al recurrente y que, por mediar la debida relación de causa a efecto, requieren la adecuada y equitativa reparación, y cuya determinación concreta tendrá lugar en trámite de ejecución de sentencia." ■

Lo antes expuesto dispone del tercer, cuarto y quinto señalamientos de error. El récord sostiene los daños sufridos por el demandante y concedidos, excepto las partidas de $100 de una cortina y $156 de gastos misceláneos que representan una inversión en bienes recuperable. Los fundamentos de error primero y segundo no ameritan detenida consideración. Ya apuntamos que el arrendador en momento alguno pretendió recuperar la propiedad para su uso o para retirarla del mercado de alquileres, ni interesaba reservarse local al-

guno después de reedificada. Cfr: *Hernández* v. *Tribunal*, 79 D.P.R. 477; *Mouriño* v. *Tribunal*, 76 D.P.R. 273. Dentro de los fines que persigue la Ley de Alquileres Razonables, el apartado (e) del inciso (8) es una reglamentación válida. ▮▮▮

En cuanto a que la Ley de Alquileres Razonables es toda anticonstitucional por no existir ya un estado de guerra, no cabe dar tan raso alcance a sus fines y propósitos. Aun cuando no existe un estado de hostilidades, la relación arrendaticia al igual que el disfrute de cualquier otro derecho de propiedad puede ser reglamentada por el Estado en interés y bienestar de la comunidad. Esa reglamentación forma parte ya de un cuerpo de derecho social encaminado a la protección del inquilino, parte jurídicamente más débil, y trasciende meros estados transitorios de emergencia. Como observa Castán comentando la Exposición de Motivos de la Ley de Arrendamientos Urbanos española de 1946, esta reglamentación se inspira en directrices de justicia social.— Castán, *Tratado Práctico de Arrendamientos Urbanos* (1956) Tomo I, págs. 72 y ss.—Aun cuando la consideráramos como una legislación meramente transitoria de emergencia, los apelantes no han traído al récord los elementos de prueba necesarios para demostrar que no existe ya la situación de orden público que justificó su aprobación. [9]

*Se modifica la sentencia recurrida rebajando del monto de la indemnización las partidas de $100 y $156 mencionadas, y así se confirmará.*

---

[9] Cfr: *Chastleton Corp.* v. *Sinclair*, 264 U.S. 543; *Home Bldg. & Loan Assn.* v. *Blaisdell*, 290 U.S. 398; *Kress, Dunlap & Lane* v. *Downing*, 193 F. Supp. 874, 878; *Kress, Dunlap & Lane* v. *Downing*, 286 F.2d 212, 215.